**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | |
|---|---|
| **National Police Association, Inc.**, <br><br> *Plaintiff,* <br><br> *v.* <br><br> **Gannett Co., Inc.**; and **The Associated Press, Inc.**, <br><br> *Defendants.* | **Civil Case No.**  1:21-cv-1116 |

## Verified Complaint for Damages and Injunctive Relief

Plaintiff National Police Association, Inc. ("NPA") complains against Defendants as follows:

## Introduction

**1.** This is a civil action, seeking damages and injunctive relief, arising under Indiana law for defamation.

**2.** This action concerns the legality of certain false and defamatory statements about NPA in articles published by defendants, who had knowledge of the statements' falsehood.

**3.** This action also concerns the legality of the continuing publication of certain false and defamatory statements in the same articles, which statements remain readily accessible by the general public to this day.

1

## Jurisdiction and Venue

**4.** This court has jurisdiction under 28 U.S.C. § 1332 because there is diversity of citizenship and an amount in controversy greater than $75,000.

**5.** Venue is proper pursuant to 28 U.S.C § 1391 because the events giving rise to this complaint happened in this district.

## Parties

**6.** Plaintiff NPA is a registered 501(c)(3) educational organization incorporated in Indiana with a principal place of business in Noblesville, Indiana. Its mission is to educate supporters of law enforcement in how to help police departments accomplish their goals. In pursuit of this mission, it employs mailings, national TV and radio public service announcements, legal filings on behalf of police officers and agencies, original articles authored for the NPA by law enforcement experts, book publishing, and a podcast, among other efforts. As a nonprofit organization, it is supported solely through contributions of individuals and organizations.

**7.** Defendant Gannett Co., Inc. ("Gannett") is a holding company that owns *Indianapolis Star*, a news publication printed at 130 S. Meridian St., Indianapolis, Indiana 46225, and is incorporated in Delaware with a principal place of business at 7950 Jones Branch Drive, McLean, Virginia 22107.

**8.** Defendant The Associated Press, Inc. ("AP") is a non-profit news publisher incorporated in New York with a principal place of business at 200 Liberty Street, New York, New York 10281.

**Verified Compl. for**
**Damages and Inj. Relief**                    2

## Facts

**9.** In 2019, Defendants published a total of three articles containing false and defamatory claims about NPA, relying on statements from various sources. These sources, soon after the publication of the articles, retracted their statements and corrected them. However, despite these retractions, despite corrections that demonstrated the falsehood of the original claims, and despite retraction demand letters that specifically noted each false and defamatory statement and described the retractions and corrections of the initial claims, Defendants refused to retract any of the articles. These articles remain published and readily accessible by the general public to this day, and continue to cause damages to NPA. These actions by Defendants constitute defamation.

### A. The First *Indianapolis Star* Article

**10.** On March 17, 2019, the *Indianapolis Star*, a news publication employing both online and print media, published on its website, a well-known and widely read news source, an article about NPA (attached hereto as Exhibit 1) with the title, "This Indianapolis charity says it helps police. Police chiefs say it's a scam." [sic]. James Briggs & Ryan Martin, *This Indianapolis Charity Says It Helps Police. Police Chiefs Say It's a Scam.*, IndyStar, https://www.indystar.com/ story/news/investigations/2019/03/17/national-police-association-says-its-helping-police-chiefs-say-its-scam/3144585002 [hereinafter "Scam" Article] (last visited Apr. 23, 2021, 4:15 PM).

**11.** Beyond the title's claim that "[p]olice chiefs say it's a scam," *id.*, the article included a variety of additional claims that NPA is a scam or otherwise fraudulent, including, but not limited to, the following.

**12.** First, the article stated, "At least four police departments in four states have found the

letters to be confusing and misleading enough to issue 'scam alerts' in their communities." *Id.*

**13.** Second, the article stated, "The National Police Association has been flagged for scam alerts at police departments around the country." *Id.*

**14.** Third, the article stated, "Germantown Police Chief Peter Hoell . . . reported the National Police Association to the U.S. Postal Inspection Service over what he considered to be fraudulent mail." *Id.*

**15.** Fourth, the article stated, "Germantown Police Chief Peter Hoell . . . [said], 'It's a scam. . . . It's no different than any other scam — just a different angle.'" *Id.*

**16.** These statements were false and defamatory.

**17.** "Scam," used in its literal sense, refers to criminal activity. *See*, *e.g.*, *United States v. Landwer*, 640 F.3d 769, 771 (7th Cir. 2011) (in mail fraud case, stated, "Landwer . . . used complex real-estate instruments to *scam* victims out of property, liquidated clients' investment funds for his own use and channeled the proceeds in a manner that covered up his theft," specifically stating that "scam" was "perpetrated": "he perpetrated a financial *scam*") (emphasis added); *United States v. Madrane*, 70 F. App'x 367, 368 (7th Cir. 2003) (referring to someone being "prosecuted" for a scam: "Madrane helped the government apprehend and prosecute his partner in the credit-card scam . . . "); *United States v. Thomas*, 199 F.3d 950, 951 (7th Cir. 1999) (in appeal of guilty sentence for wire fraud, court stated that the issue at bar was "whether the district court erred when it found that the 'jointly undertaken criminal activity' . . . in which Thomas participated was the whole *scam*," using "scam" as shorthand for "a telemarketing fraud scheme") (emphasis added); *Scott v. State*, 867 N.E.2d 690, 695 (Ind. Ct. App. 2007) (in forgery

**Verified Compl. for**
**Damages and Inj. Relief**                    4

and money laundering case, court stated defendant possessed "correspondence pertain[ing] to similar money laundering *scams*" and that "a jury could infer from [the] correspondence regarding similar *scams* . . . that [he] knew of the illegality of [the check he attempted to cash]") (emphasis added).

**18.** In the article's statements, the word "scam" was used in its literal sense. This is demonstrated by the references to community alerts and flagging by official figures, the reference by a law enforcement official to different "angles" by which scams may be carried out, and the reference to an official law enforcement figure making a report to the U.S. Postal Inspection Service. "Scam" Article, *supra.* One does not use such language and actions if intending to suggest something is a "scam" only in a non-literal or hyperbolic way. This is especially the case when the speaker in question is a law enforcement official.

**19.** Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**20.** Similarly, the article included a claim characterizing NPA as using predatory techniques: "[Laura] Houston, [the chief of the Belle Isle Police Department in Florida,] noting that her city has a large population of elderly residents, said the letter was crafted as 'pleas to those who are easily preyed upon.'" *Id.*

**21.** This statement was false and defamatory, and it demonstrates that the article's use of the term "scam" was meant literally and non-hyperbolically.

**Verified Compl. for**
**Damages and Inj. Relief**                              5

22. Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

23. The article included various claims that NPA had lied in specific ways including, but not limited to, the following four.

24. First, the article stated, "Fundraising letters in Germantown, Wisconsin, last year falsely warned that Germantown is a sanctuary city . . . ." *Id.*

25. Second, the article stated, "[An NPA] letter says . . . 'Give our law enforcement officers the crime prevention tools they need.' A donation of $10, $15 or $25 would help keep communities like Trenton safe. Donations, however, aren't directed to the Trenton Police Department . . . . 'I'm thinking, "What the hell is this, using our name and our police department to raise funds?"' Trenton Police Lt. Mike Hawkins told IndyStar. 'Get out of here.'" *Id.*

26. Third, the article stated, "[P]eople in [Belle Isle, Florida] started receiving mail that claimed they lived in a sanctuary city," and, "Belle Isle on March 6 posted a message to Facebook telling residents that 'Belle Isle is not a sanctuary city . . . .'" *Id.*

27. Fourth, the article stated, "Laura Houston, the chief of the Belle Isle Police Department in Florida . . . [said,] 'I can't substantiate that this is a legitimate organization and the fact that it announces we are a sanctuary city, and we're not, that is enough for me to recommend our residents not send something out.'" *Id.*

**Verified Compl. for**
**Damages and Inj. Relief**                  6

28. These statements were false and defamatory, and they also demonstrate that the article's use of the term "scam" was meant literally and non-hyperbolically.

29. Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**B. The AP Article**

30. On March 18, 2019, AP published on its website, a well-known and widely read news source, an article about NPA (attached hereto as Exhibit 2) entitled, "Police question authenticity of nonprofit's fundraising" [sic]. Associated Press, *Police Question Authenticity of Nonprofit's Fundraising*, AP News, https://apnews.com/article/41034ee39fdf468c9bb1fc703bce0882 (last visited Apr. 23, 2021, 4:17 PM).

31. This article included a variety of claims that the NPA is a scam or otherwise fraudulent, including, but not limited to, the following.

32. First, the article stated, "Police departments in at least four states have raised concerns about an Indianapolis-based nonprofit, alleging the group conducts fundraising scams targeting vulnerable people under the guise of raising money for law enforcement." *Id.*

33. Second, the article stated, "The Trenton Police Department in Michigan is among the agencies that have issued scam alerts about letters sent by the National Police Association, The Indianapolis Star reported." *Id.*

**Verified Compl. for**
**Damages and Inj. Relief**       7

**34.** Third, the article stated, "'It's a scam,' Hoell said. 'It's no different than any other scam — just a different angle.'" *Id.*

**35.** Fourth, the article stated, "Hoell said he reported the case to the U.S. Postal Inspection Service for fraudulent mail, but hasn't received an update on the issue." *Id.*

**36.** These statements were false and defamatory.

**37.** In these statements, the word "scam" was used in its literal sense. This is demonstrated by the references to community alerts and flagging by official figures, the reference by a law enforcement official to different "angles" by which scams may be carried out, and the reference to an official law enforcement figure making a report to the U.S. Postal Inspection Service. *Id.* One does not use such language and actions if intending to suggest something is a "scam" only in a non-literal or hyperbolic way. This is especially the case when the speaker in question is a law enforcement official.

**38.** Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**39.** Similarly, the article included a claim characterizing NPA as using predatory techniques: "Critics also said the nonprofit's letters target vulnerable people and use fear-mongering language." *Id.*

**40.** This statement was false and defamatory, and it also demonstrates that the article's use of the term "scam" was meant literally and non-hyperbolically.

41. Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

42. The article included various claims that the NPA lied in specific ways, including, but not limited to, the following.

43. The article stated, "[NPA fundraising] letters indicate the group is raising money for law enforcement in the Trenton area, but the police department has never received any funds, said Police Chief Todd Scheffler." *Id.*

44. The article stated, "Critics . . . cit[ed] instances in which the organization sent letters wrongly telling the recipients that they lived in a 'sanctuary city' . . . ." *Id.*

45. The article stated, "Germantown Police Chief Peter Hoell said residents in his Wisconsin village received such letters, though it isn't a sanctuary city." *Id.*

46. These statements were false and defamatory, and they demonstrate that the article's use of the term "scam" was meant literally and non-hyperbolically.

47. Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

### C. The Second *Indianapolis Star* Article

**48.** On July 15, 2019, the *Indianapolis Star* published on its website a second article about NPA (attached hereto as Exhibit 3) with the title, "A pro-police Indianapolis nonprofit is suing 2 police officers" [sic]. James Briggs & Ryan Martin, *A Pro-Police Indianapolis Nonprofit Is Suing 2 Police Officers*, IndyStar, https://www.indystar.com/story/news/investigations/2019/07/15/national-police-association-suing-two-trenton-police-officers-michigan/1696197001/ [hereinafter "Suing" Article] (last visited Apr. 23, 2021, 4:04 PM).

**49.** This article included a variety of claims that NPA is a scam or otherwise fraudulent, including, but not limited to, the following.

**50.** First, the article stated in a subheading, "Police chiefs say [NPA]'s a scam." *Id.*

**51.** Second, the article stated, "Four police departments in four states told IndyStar that the letters were 'scams.'" *Id.*

**52.** Third, the article stated, "[T]he [Trenton police] department . . . issue[d] a 'scam' warning on Facebook." *Id.*

**53.** These statements were false and defamatory.

**54.** In the article's statements, the word "scam" was used in its literal sense. This is demonstrated by the references to public alerts and flagging by law enforcement officers and by the article's reference and hyperlink to the "Scam" article. *Id.* One does not use such language and actions if intending to suggest something is a "scam" only in a non-literal or hyperbolic way. This is especially the case when the speaker in question is a law enforcement official.

**Verified Compl. for
Damages and Inj. Relief**                      10

**55.** Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**56.** Similarly, this article included a claim characterizing NPA as using unethical and deceitful fundraising "tactics": "Law enforcement officers across the U.S. have denounced the National Police Association's fundraising tactics and warned residents not to contribute money." *Id.*

**57.** This statement was false and defamatory, and it also demonstrates that the article's use of the term "scam" was meant literally and non-hyperbolically.

**58.** Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**59.** The article claimed that NPA had lied in specific ways including, but not limited to, the following.

**60.** The article stated, "[Trenton police] officers criticized the National Police Association's fundraising letters, which, they said, sought to raise money under the guise of being linked to their department." *Id.*

**61.** This statements was false and defamatory, and it demonstrates that the article's use of the term "scam" was meant literally and non-hyperbolically.

**Verified Compl. for**
**Damages and Inj. Relief**                11

62. Because NPA is a nonprofit organization that both advocates for law enforcement and relies upon donations from those who understand such money is not being obtained fraudulently or for fraudulent purposes, these statements imputed misconduct of the gravest sort to NPA in its profession.

**D. The Retractions**

63. While the *Indianapolis Star*'s "Scam" Article states, "At least four police departments in four states have found the letters to be confusing and misleading enough to issue 'scam alerts' in their communities," only three police departments are specifically mentioned in the article: Germantown, Wisconsin; Trenton, Michigan; and Belle Isle, Florida. Scam Article, *supra.*

64. Each of these three municipalities has issued a retraction of these statements.

65. Steven R. Kreklow, Village Administrator of the Village of Germantown, Wisconsin, wrote a letter (attached hereto as Exhibit 4) in reference to "Former Village of Germantown Police Chief Hoell['s] . . . public comments about a letter from the National Police Association after residents reported receiving the letter stating that Germantown is a sanctuary area." Letter from Steven R. Kreklow, Vill. Adm'r of the Vill. of Germantown, Wis., to Derek Peterson, Chief Legal Officer of the Nat'l Police Ass'n (Dec. 17, 2020), https://nationalpolice.org/dev/ wp-content/uploads/2020/12/ Germantown-retraction-letter.pdf. This letter retracted Chief Hoell's allegations. *Id.*

66. This letter stated, "[T]he National Police Association has provided us information of Milwaukee passing a sanctuary resolution prior to the NPA letter in question, the Milwaukee Public School policy of opposing cooperation with Immigration and Customs Enforcement

**Verified Compl. for
Damages and Inj. Relief**                    12

(ICE), and a Department of Homeland Security policy statement on failure to enforce ICE

Detainers. To be clear, Germantown is not a sanctuary city and has always cooperated with the

Federal Government, however, Germantown is a part of the Milwaukee metropolitan area." *Id.*

**67.** The letter also stated, "Germantown has since confirmed that the National Police

Association is an actual organization recognized by the Internal Revenue Service." *Id.*

**68.** The Trenton Police Department revised its Facebook post (attached hereto as Exhibit

5) to clarify that, "The National Police Association is an official organization." Trenton Police

Department, *Trenton Police May 17, 2019 Photo-Post*, Facebook, https://nationalpolice.org/dev/

wp-content/uploads/2020/09/Trenton-PD-Facebook-Post-Revised.pdf [hereinafter Trenton

Facebook Post] (last visited Apr. 23, 2021, 4:18 P.M.) (screenshot of since-deleted Facebook

post).

**69.** This Facebook post also clarified that its department name was not used in NPA's

fundraising, including a photo of the fundraising letter in question, showing that it contains no

reference to the Trenton Police Department. *See id.*

**70.** The Trenton Police Department also removed any reference to a "scam" from its

website.

**71.** The City of Belle Isle updated a post (attached hereto as Exhibit 6) on its Facebook

page to state, "Belle Isle residents have reported receiving a letter from the National Police

Association stating that Belle Isle is a Sanctuary Area. . . . [A]t the time the letters were sent,

Belle Isle has determined that Orange County was identified by U.S. Department of Homeland

Security as a 'sanctuary area.'" City of Belle Isle, Florida, *Aug. 20, 2020 Edit History for Status*

**Verified Compl. for**
**Damages and Inj. Relief**                13

*Posted Mar. 6, 2019*, Facebook, https://www.facebook.com/permalink.php?story_fbid=
1969954443313028&id=1784466608528480 [hereinafter Belle Isle Facebook Post] (last visited
Apr. 23, 2021 4:19 P.M.).

**72.** Because Belle Isle is a city in Orange County, Florida, and because this post clarifies
that NPA's letter referred only to a "sanctuary area," *id.*, this serves as a retraction of Laura
Houston's characterizations of the NPA's letter.

**73.** Furthermore, this post states, "The Belle Isle Police Department has confirmed that
the National Police Association is an official organization." *Id.*

**E. Notice, Response, Damage**

**74.** The Indianapolis Star and the AP have been given notice of the defamatory nature of
their articles and of these various retractions.

**75.** In compliance with Indiana Code § 34-15-4-2 (requiring an aggrieved party, before
bringing suit for the publication or transmission of libel by a newspaper or news service, to
"serve notice in writing specifying the factual statements in the article that are alleged to be false
and defamatory, and correcting the falsity of the statements by reference to the true facts"), the
Bopp Law Firm PC stated in a letter (attached hereto as Exhibit 7) dated February 19, 2021, to
the publisher of the *Indianapolis Star*, "[Y]ou are hereby served notice . . . that the article . . .
titled "*This Indianapolis charity says it helps police. Police chiefs say it's a scam.*" contains
false and defamatory statements. . . ." Letter from James Bopp, Jr., Att'y for NPA, to Publisher
of the Indianapolis Star (Feb. 19, 2021) [hereinafter Gannett Letter 1].

**Verified Compl. for
Damages and Inj. Relief**                          14

**76.** This letter detailed these statements, listing the facts described above, including the true facts of the matter. *Id.*

**77.** This letter also demanded a retraction of the "Scam" Article. *Id.*

**78.** In response to this letter, Thomas Curley stated in a letter (attached hereto as Exhibit 8) dated February 23, 2021, "[T]he *Star* respectfully disagrees with the NPA's assertion that the challenged report should be retracted or is otherwise actionable." Letter from Thomas Curley, Att'y for Gannett, to James Bopp, Jr. (Feb. 23, 2021) [hereinafter Gannett Response 1].

**79.** The "Scam" Article has, as of the day of this filing, not been retracted. Scam Article, *supra*.

**80.** In compliance with Indiana Code § 34-15-4-2, *supra*, the Bopp Law Firm stated in a letter (attached hereto as Exhibit 9) dated February 19, 2021 to the chief of the Indiana Bureau of the AP, in reference to its article, "[Y]ou are hereby served notice . . . that the article . . . contains false and defamatory statements . . . ." Letter from James Bopp, Jr., Att'y for NPA, to George Garties (Feb. 19, 2021) [hereinafter AP Letter].

**81.** This letter detailed these statements, listing the facts described above, including the true facts of the matter. *Id.*

**82.** This letter also demanded a retraction of the AP article. *Id.*

**83.** In response to this letter, Brian Barrett stated in a letter (attached hereto as Exhibit 10) dated March 1, 2021, "[W]e respectfully disagree that the AP article contains any errors, and we do not intend to issue a retraction." Letter from Brian Barrett, Assistant General Counsel for the Associated Press, to James Bopp, Jr. (Mar. 1, 2021) [hereinafter AP Response].

**84.** The AP article has, as of the day of this filing, not been retracted. Associated Press, *supra*.

**85.** In compliance with Indiana Code § 34-15-4-2, *supra*, the Bopp Law Firm stated in a letter (attached hereto as Exhibit 11) dated March 22, 2021 to the publisher of the *Indianapolis Star*, "[Y]ou are hereby served notice . . . that the article . . . titled '*A pro-police Indianapolis nonprofit is suing 2 police officers*' contains false and defamatory statements. . . ." Letter from James Bopp, Jr., Att'y for NPA, to Publisher of the Indianapolis Star (Mar. 22, 2021) [hereinafter Gannett Letter 2].

**86.** This letter detailed these statements, listing the facts described above, including the true facts of the matter. *Id.*

**87.** This letter also demanded a retraction of the "Suing" Article. *Id.*

**88.** In response to this letter, Thomas Curley stated in a letter (attached hereto as Exhibit 12) dated April 9, 2021, "[T]he *Star* again disagrees with the NPA's assertion that the challenged report should be retracted or is otherwise actionable." Letter from Thomas Curley, Att'y for Gannett, to James Bopp, Jr. (Apr. 9, 2021) [hereinafter Gannett Response 2].

**89.** The "Suing" Article has, as of the day of this filing, not been retracted. "Suing" Article, *supra*.

**90.** The monetary damages to NPA caused by these defamatory articles, as reflected by the cost of future online reputation repair services, are estimated (in a report attached hereto as Exhibit 13) to be up to $91,851 for one year, up to $448,058 for five years, up to $869,133 for ten years, and up to $1,636,737 for 20 years. Letter from Stan V. Smith, Ph.D., President of

**Verified Compl. for
Damages and Inj. Relief**                   16

Smith Econ. Grp., Ltd., to Ed Hutchison, President, Nat'l Police Ass'n. (Aug. 25, 2020). These are the only compensatory damages sought by NPA herein.

**F. Law**

**91.** Generally under Indiana law, "To establish defamation, the plaintiff must prove the following elements: (1) a communication with defamatory imputation, (2) malice, (3) publication, and (4) damages." *Carney v. Patino*, 114 N.E.3d 20, 28 n.3 (Ind. Ct. App. 2018) (internal quotation marks omitted) (citing *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999) *trans. denied* (2000)).

**92.** However, "[a] communication is defamatory *per se* if it imputes . . . criminal conduct . . . [or] misconduct in a person's trade, profession, office, or occupation," *Kelley v. Tanoos*, 865 N.E.2d 593, 596 (Ind. 2007) (citing *Rambo v. Cohen*, 587 N.E.2d 140, 145 (Ind. Ct. App. 1992)), and "the language of [the] statement, without reference to extrinsic evidence . . . of [its] injurious character," conveys such an imputation, *Wartell v. Lee*, 47 N.E.3d 381, 385–87 (Ind. Ct. App. 2015) (distinguishing claims that a person's "word [does] not always serv[e] as his bond, or that his 'character is at issue,' or that he 'lacks integrity,' or has 'broken faith'" (too vague to be considered defamatory without further evidence) from claims that an employee "was 'stealing time,' working on a 'scheme with her boss . . . allegedly an attempt to defraud the Company,' and 'stealing an air compressor from the Company'"–claims "that were so obviously and naturally harmful that proof of their injurious character could be dispensed with"). *See also* Restatement (Second) of Torts § 573 cmt. b (1977) ("The [defamation *per se*] rule not only

protects persons who, as individuals, conduct business or industry, but . . . also protects the corporation itself against slander").

93. "In an action for defamation *per se* the plaintiff is entitled to presumed damages as a natural and probable consequence of the *per se* defamation." *Kelley*, 865 N.E.2d at 597 (citing *Rambo*, 587 N.E.2d at 145) (internal quotation marks omitted).

94. "Defamatory imputation" may be understood by the more general definition of "defamation": "Defamation is that which tends to injure reputation or to diminish esteem, respect, good will, or confidence in the plaintiff, or to excite derogatory feelings or opinions about the plaintiff." 114 N.E.3d at 28 n.3. (internal quotation marks omitted).

95. Additionally, in order to qualify as defamatory, "a false statement of fact is required." *Hamilton v. Prewett*, 860 N.E.2d 1234, 1243 (Ind. Ct. App. 2007).

96. While certain pejoratives have, in particular circumstances, been construed by courts as incapable of defamatory meaning because they are "mere hyperbole"–not intended to be statements of fact in the first place–the Seventh Circuit has noted that such terminology must be analyzed on a case-by-case basis. *Dilworth v. Dudley*, 75 F.3d 307, 310 (7th Cir. 1996). "[T]erms or epithets that have been held . . . incapable of defaming because they are mere hyperbole rather than falsifiable assertions of discreditable fact [include] . . . 'scam' . . . . [T]he defamatory capability of [such] terms cannot be determined without consideration of context." *Id.* (citations omitted).

97. *Dilworth* gives three examples, noting that "scab" "means literally one who is hired to replace a striking worker," and that "if a union leader were accused of having been a scab in his

youth, this could well be understood to be a literal use of the word and therefore an assertion that he had engaged in conduct that demonstrated his unfitness to be a union leader." *Id.* If untrue, then, such a literal use could be defamatory. *Id.* "But," *Dilworth* notes, "it is also used figuratively, to denote a worker who is not a union supporter. If as in *National Association of Letter Carriers v. Austin* . . . a person is called a 'scab' in a union newsletter because he refuses to join a union, this is not defamation but merely an expression of hostility." *Id.* "And so with 'traitor,' another word held nondefamatory in *National Association of Letter Carriers v. Austin*. The use of the word in the context of that case was plainly figurative rather than literal, but the word was being used in its literal sense when Whittaker Chambers called Alger Hiss a traitor. Another example would be calling a person a 'lunatic.'" *Id.*

98. *Dilworth* therefore establishes that such pejoratives can constitute defamation if used non-hyperbolically in their literal, rather than figurative, sense. This includes "scam," which *Dilworth* mentions specifically, citing to a case in which it was used in a figurative sense, but noting that, along with all the other terms listed, "scam" could be defamatory if used literally. *Id.* (citing *McCabe v. Rattiner*, 814 F.2d 839 (1st Cir.1987)).

99. In adjudicating the malice element, Indiana courts have long held that, in matters involving the "general or public interest," actual malice is required to prove defamation. *Aafco Heating & Air Conditioning Co. v. Nw. Publ'ns, Inc.*, 321 N.E.2d 580, 586 (Ind. Ct. App. 1974). *See also State Farm Fire & Cas. Co. v. Radcliff*, 987 N.E.2d 121, 138 (Ind. Ct. App. 2013).

**100.** "Actual malice" is a reference to the defendant's knowledge: if the defendant knew the statement was false or gave reckless disregard to whether it was false, then he possessed actual malice. *Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 868 (7th Cir. 2018).

**101.** Furthermore, "To demonstrate reckless disregard, '[t]here must be sufficient evidence to permit the conclusion that the defendant . . . entertained serious doubts as to the truth of his publication,' or proof that the false publication was made with a 'high degree of awareness of their [sic] probable falsity.'" *Id.* (first alteration in original) (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968) and *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964), respectively) (citing *Journal-Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 456 (Ind. 1999)).

**102.** Malice must be tied to the other elements of defamation in order for a plaintiff to succeed. On the connection of malice and publication, the Seventh Circuit's reliance on Restatement (Second) of Torts § 577 is instructive. This section provides a formulation for liability for defamatory publication, which the Seventh Circuit adopted in a case arising under Indiana law after the *Aafco* decision. *Tacket v. General Motors Corp.*, 836 F.2d 1042, 1046–47 (7th Cir. 1987).

**103.** The Restatement notes that two sorts of publication activity can give rise to liability: "(1) Publication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed. (2) One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." Restatement (Second) of Torts § 577

(Am. Law Inst. 1977). It is the latter sort of publication, "continued publication," that applies in this case.

104. In *Tacket*, a case arising under Indiana law, the Seventh Circuit applied Restatement (2nd) of Torts, § 577 (2) in a case wherein a corporation failed to remove an allegedly defamatory sign, and remanded the case to jury to determine, under that rule, whether the corporation "published the . . . sign by inaction." *Tacket*, 836 F.2d at 1046–47.

105. Thus, under Indiana law, liability for defamation may be imposed for "continued publication," that is, for a defendant's failure to remove a defamatory statement once the defendant has received notice of its falsehood. *Id. See also* Restatement (Second) of Torts § 577 cmt. p (Am. Law Inst. 1977) ("the duty arises only when the defendant knows that the defamatory matter is being exhibited on his land or chattels").

106. The "continued publication" rule applies to statements by third parties. *Tacket*, for example, contains no discussion of who produced the signs at issue, but rather spoke of their creation only in non-specific terms: "*Someone* painted this sign on an inside wall of Plant 17 . . . . [Previously,] a sign approximately 3' x 30' *appeared* inside Plant 17 . . . . The smaller stenciled sign *replaced* it." *Id.* at 1043, 1045 (emphases added). And part of *Tacket*'s concluding language was: "A reasonable person could conclude that Delco 'intentionally and unreasonably fail[ed] to remove' this sign *and thereby published its contents*." *Id.* at 1047 (emphasis added).

107. Therefore, under this rule, if someone "hosts" a defamatory statement–that is, if someone has authority and control over a particular forum and "intentionally and unreasonably"

**Verified Compl. for**
**Damages and Inj. Relief**                21

allows the statement to remain upon that forum–then the publication element of defamation is met and he may be found guilty if the other elements are met.

## Count I - Continued Publication Defamation

**108.** Plaintiff realleges and incorporates by reference all above facts and allegations.

**109.** Defendants Gannett and AP published false and defamatory articles about NPA on their websites.

**110.** The false statements contained in these articles included, but were not limited to, the various claims that NPA's fundraising efforts were a "scam" or were otherwise fraudulent. Associated Press, *supra*; "Scam" Article, *supra*; "Suing" Article, *supra*. The falsity of these allegations is demonstrated by the fact that all three of the municipalities specifically cited in the articles issued retractions and corrections of the statements at issue. Specifically, these municipalities were the Village of Germantown, Letter from Steven R. Kreklow, *supra*; the Trenton Police Department, Trenton Facebook Post, *supra*; and the City of Belle Isle, Belle Isle Facebook Post, *supra*.

**111.** The false statements contained in these articles moreover included, but were not limited to, the claims that NPA falsely called certain areas "sanctuary cities." Associated Press, *supra*; "Scam" Article, *supra*. The falsity of these allegations is demonstrated by the fact that both the Village of Germantown and the City of Belle Isle retracted and corrected their statements that NPA had called their municipalities "sanctuary cities." Letter from Steven R. Kreklow, *supra*; Belle Isle Facebook Post, *supra*.

**112.** These articles were defamatory *per se*, as they "impute[d] . . . criminal conduct," 865 N.E.2d at 596, to NPA.

**113.** These articles were defamatory *per se* on the additional grounds that they "impute[d] . . . misconduct in [NPA's] trade, profession, office, or occupation," *id.*

**114.** Defendant Gannett has received letters from NPA's attorney describing the false and defamatory nature of both the "Scam" Article and the "Suing" Article. Gannett Letter 1, *supra*; Gannett Letter 2, *supra*; *see also* Gannett Response 1, *supra* (acknowledging receipt of Gannett Letter 1); Gannett Response 2, *supra* (acknowledging receipt of Gannett Letter 2).

**115.** Defendant AP has received a letter from NPA's attorney describing the AP article's false and defamatory nature. AP Letter, *supra*; *see also* AP Response, *supra* (acknowledging receipt).

**116.** These articles remain published on the defendants' websites, where they are publically available and can be accessed by the public, to this day. Associated Press, *supra*; "Scam" Article, *supra*; "Suing" Article, *supra*.

**117.** Such continuing publication is unreasonable in light of the ease with which an article can be removed from a website, at the click of a button. This is not "the interior of a subway car in New York City . . . over which supervisory personnel exercise [lesser] supervision and control." *Tacket*, 836 F.2d at 1046–47. Rather, "The costs of vigilance are small (most will be incurred anyway), and the benefits potentially large." *Id.* at 1047.

**118.** The Defendants possessed not only "a high degree of awareness of the[] probable falsity" of these articles, *Mimms*, 889 F.3d at 868 (citing *Bandido's, Inc.*, 712 N.E.2d at 456), but

**Verified Compl. for**
**Damages and Inj. Relief**                23

actual "*knowledge* that [they were] false" and defamatory, *id.* (emphasis added), yet unreasonably failed to remove them after ample notice. They have therefore defamed NPA with actual malice by their continued publication of these articles.

**119.** In addition to the presumed damages occurring as a natural and probable consequence of the *per se* defamation, this has resulted in damages to the plaintiff of up to $91,851 for one year and up to $1,636,737 for 20 years, the cost to continue to protect Plaintiff's reputation. Letter from Stan V. Smith, *supra*.

## Prayer for Relief

**WHEREFORE**, Plaintiff prays for the relief set forth below:

**120.**  Award compensatory damages in an amount not less than $91,851 to which Plaintiffs are found to be entitled;

**121.** Award punitive damages;

**122.** Award interest, costs, and reasonable attorney fees;

**123.** Enjoin the Defendants from further wrongdoing and/or acts of retaliation;

**124.** Order further injunctive relief directing the Defendants, and all persons acting in concert with any of them, or pursuant to their permission or authority, to: (a) immediately cease and refrain from making further false, defamatory and/or disparaging remarks regarding Plaintiff, (b) immediately retract any statements portraying Plaintiff in a false or negative light both verbally and in writing, and through publication on any and all online platforms, including social media platforms; and (c) remove from their website and public display the first *Indianapolis Star* article, the second *Indianapolis Star* article, and the AP article.

**Verified Compl. for
Damages and Inj. Relief**                24

**125.** Grant any other relief this Court deems appropriate.

Respectfully submitted,

/s/ James Bopp, Jr.

James Bopp, Jr., IN # 2838-84
Courtney Turner Milbank, IN# 32178-29
Joseph D. Maughon, VA# 87799*
THE BOPP LAW FIRM, PC
1 South Sixth Street
Terre Haute, IN 47807-3510
(812) 232-2434 - Telephone
(812) 235-3685 - Facsimile
jboppjr@aol.com
cmilbank@bopplaw.com
jmaughon@bopplaw.com
*Counsel for Plaintiff*
*Pro hac vice* application forthcoming

**Verified Compl. for
Damages and Inj. Relief**          25