**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| **NATIONAL POLICE ASSOCIATION, INC.,** | ) | **No. 1:21-cv-1116-TWP-DLP** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GANNETT CO., INC., and THE ASSOCIATED** | ) | |
| **PRESS, INC.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS GANNETT CO, INC. AND THE ASSOCIATED PRESS, INC.'S**
**MOTION TO DISMISS PLAINTIFF'S COMPLAINT**

Defendants Gannett Co., Inc. and The Associated Press, Inc. move to dismiss Plaintiff's complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. Plaintiff's complaint is both time barred and barred by collateral estoppel. Further, Defendants' publications were privileged, Plaintiff has not alleged actual malice at the time of publication, Indiana does not recognize a tort for "continued publication defamation," and, in any event, the statements at issue are non-actionable opinions. For these reasons, and as more fully explained in the memorandum of law that accompanies this motion, Plaintiff's complaint should be dismissed with prejudice.

/s/ Tracy Betz
Tracy Betz, Atty. No. 24800-53
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
tbetz@taftlaw.com

—and—

Lynn Rowe Larsen (*pro hac vice*)
Daniel H. Bryan (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Telephone:  216-241-2838
*llarsen@taftlaw.com*
*dbryan@taftlaw.com*

*Attorneys for Defendants Gannet Co., Inc.
and The Associated Press, Inc.*

2

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| **NATIONAL POLICE ASSOCIATION, INC.,** | ) | **No. 1:21-cv-1116-TWP-DLP** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **GANNETT CO., INC.; and THE ASSOCIATED PRESS, INC.,** | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |

## DEFENDANTS GANNETT CO, INC. AND THE ASSOCIATED PRESS, INC.'S MEMORANDUM IN SUPPORT OF THEIR <u>MOTION TO DISMISS PLAINTIFF'S COMPLAINT</u>

Tracy Betz, Atty. No. 24800-53
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
*tbetz@taftlaw.com*

*—and—*

Lynn Rowe Larsen (*pro hac vice*)
Daniel H. Bryan (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Telephone:  216-241-2838
*llarsen@taftlaw.com*
*dbryan@taftlaw.com*

*Attorneys for Defendants Gannet Co., Inc. and The Associated Press, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

RELEVANT FACTS ............................................................................................... 4

    A.   The National Police Association. .......................................................... 4

    B.   Multiple police departments issued warnings about NPA to the public. ......... 4

    C.   The March 17, 2019 *IndyStar* article; Wire publication by AP. .................... 6

    D.   NPA sues Trenton Police; The *IndyStar* July 15, 2019 article reports the suit. ............... 9

    E.   Some police departments issue letters or update their alerts. ......................... 11

ARGUMENT ....................................................................................................... 11

I.    NPA's claim arising out of the first *IndyStar* article and AP article is time-barred. ............. 12

II.   The prior dismissal on the merits of NPA's Trenton suit dooms NPA's suit here under principles of collateral estoppel and issue preclusion........................... 13

III.  Defendants were privileged to report the allegedly defamatory statements of police officers. .................................................................................................. 15

IV.  NPA's defamation claim should be dismissed because it fails to allege actual malice "at the time" of the articles' publication. .................................................. 18

    A.   NPA is a public figure and the articles are about public concerns, so NPA must plead actual malice. ............................................................................ 18

    B.   NPA does not and cannot allege actual malice at the time of publication. .................... 20

    C.   A failure to retract is insufficient to show actual malice and will not sustain a defamation claim. .............................................................................. 23

    D.   Indiana does not recognize a claim for "continued publication defamation;" the Seventh Circuit has predicted Indiana would apply the "single publication" rule, as virtually every other state has done........................................................... 25

    E.   Restatement (Second) of Torts Section 577 is irrelevant. .............................. 28

V.   NPA's claim against the AP fails under the wire-service defense. ........................ 30

VI.  The allegedly defamatory statements are non-actionable opinion and hyperbole, based on fully disclosed facts. ................................................................... 31

    A.   The statements are not capable of defamatory meaning. ............................... 31

    B.   The statements are opinions because they are based on fully disclosed facts............... 34

CONCLUSION.................................................................................................... 35

# **TABLE OF AUTHORITIES**

**Cases**

*Abcarian v. McDonald,*
   617 F.3d 931 (7th Cir. 2010) ....................................................................... 12

*Adelson v. Harris,*
   973 F. Supp. 2d 467 (S.D.N.Y. 2013) ..................................................... 11

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)............................................................... 11, 12, 23

*Barger v. Playboy Enterprises, Inc.,*
   564 F. Supp. 1151 (N.D. Cal. 1983).......................................................... 22

*Berry v. Schmitt,*
   688 F.3d 290 (6th Cir. 2012) ....................................................................... 35

*berts v. McAfee, Inc.,*
   660 F.3d 1156 (9th Cir. 2011) ..................................................................... 30

*Biospherics, Inc. v. Forbes, Inc.,*
   151 F.3d 180 (4th Cir. 1998) ....................................................................... 34

*Biro v. Conde Nast,*
   963 F. Supp. 2d 255 (S.D.N.Y. 2013) ................................................. 21, 24

*Bolton v. Delta Air Lines,*
   182 F. Supp. 3d 768 (S.D. Ohio 2016) ..................................................... 21

*Burlet v. Baldwin,|*
   452 F. Supp. 3d 801 (N.D. Ill. 2020) ......................................................... 5

*CanaRx Services, Inc. v. LIN Television Corp.,*
   No. 1:07-cv-1482, 2008 WL 2266348 (S.D. Ind. May 29, 2008) .................. 18, 22

*Carr v. Forbes, Inc.,*
   121 F. Supp. 2d 485 (D.S.C. 2000)............................................................. 23

*Chapin v. Knight-Ridder, Inc.,*
   993 F.2d 1087 (4th Cir. 1993) ............................................................. 19, 20

*Clark v. Viacom International Inc.,*
   617 F. App'x 495 (6th Cir. 2015) ............................................................... 28

*Collins v. Purdue University,*
   703 F. Supp. 2d 862 (N.D. Ind. 2010) ....................................................... 32

*Conseco Group Risk Management Co. v. Ahrens Financial Systems, Inc.*,
   No. 00 C 5467, 2001 WL 219627 (N.D. Ill. Mar. 6, 2001) ..................................................... 19

*Croce v. New York Times Co.*,
   930 F.3d 787 (6th Cir. 2019) ................................................................................. 18

*Daniel v. City of Glendale*,
   No. 14-cv-3864, 2015 WL 5448562 (C.D. Cal. Mar. 19, 2015) ............................................ 33

*Dolatowski v. Life Printing & Publishing Co.*,
   554 N.E.2d 692 (Ill. 1st Dist. 1990)........................................................................ 16

*Dunn v. Gannett New York Newspapers, Inc.*,
   833 F.2d 446 (3d Cir. 1987) .................................................................................. 34

*Edwards v. National Audubon Society, Inc.*,
   556 F.2d 113 (2d Cir. 1977) ................................................................................. 18

*Elm Medical Laboratory, Inc. v. RKO General, Inc.*,
   532 N.E.2d 675 (Mass. 1989) ............................................................................... 16

*Fairfax v. CBS Corp.*,
   No. 20-1298, 2021 WL 2557891, --- F.3d ---- (4th Cir. June 23, 2021) ..................... 20, 21, 24

*Filippo v. Lee Publications, Inc.*,
   485 F. Supp. 2d 969 (N.D. Ind. 2007) ......................................................... 19, 20, 22

*Freedom Communications, Inc. v. Sotelo*,
   No. 11-05-00336-CV, 2006 Tex. App. LEXIS 5132 (Tex. Ct. App. June 15, 2006)............... 17

*Geinosky v. City of Chicago*,
   675 F.3d 743 (7th Cir. 2012) ........................................................................ 5, 6, 12

*Green Group Holdings, LLC v. Schaeffer*,
   No. 16-cv-00145, 2016 WL 6023841 (S.D. Ala. Oct. 13, 2016)............................................ 24

*Harte-Hanks Communications, Inc. v. Connaughton*,
   491 U.S. 657 (1989)........................................................................................ 19

*Haynes v. Alfred A. Knopf, Inc.*,
   8 F.3d 1222 (7th Cir. 1993) .................................................................................. 32

*Holden v. Clary*,
   No. 92-cv-313, 1992 WL 373145 (E.D. Va. Sept. 17, 1992) ................................................ 31

*Huon v. Denton*,
   841 F.3d 733 (7th Cir. 2016) ................................................................................. 17

iii

*Illinois, ex rel. Madigan v. Telemarketing Associates, Inc.*,
    538 U.S. 600 (2003) ................................................................................................. 20

*In re Docteroff*,
    133 F.3d 210 (3d Cir. 1997) ............................................................................ 14, 15

*In re Hodges*,
    271 B.R. 347 (Bankr. N.D. Iowa 2000) ................................................................ 15

*Jean v. Dugan*,
    20 F.3d 255 (7th Cir. 1994) ................................................................................. 12

*Johnson v. Board of School Commissioners of City of Indianapolis*,
    No. 1:09-cv-574, 2010 WL 4097149 (S.D. Ind. Oct. 6, 2010) ............................. 13

*Kapetanovic v. Stephen J. Prods., Inc.*,
    No. 97-cv-2224, 2002 WL 475193 (N.D. Ill. Mar. 27, 2002) ............................... 31

*Keeton v. Hustler Magazine, Inc.*,
    465 U.S. 770 (1984) ........................................................................................ 25, 26

*Kenney v. Scripps Howard Broadcasting Co.*,
    259 F.3d 922 (8th Cir. 2001) ............................................................................... 17

*Kiebala v. Boris*,
    928 F.3d 680 (7th Cir. 2019) ............................................................................... 27

*Kilgore v. Younger*,
    640 P.2d 793 (Cal. 1982) ..................................................................................... 17

*Kirk v. CBS, Inc.*,
    No. 83-cv-2764, 1987 WL 11831 (N.D. Ill. June 4, 1987) .................................... 33

*Konrath v. Vance*,
    No. 16-cv-02784, 2017 WL 1382778 (S.D. Ind. Apr. 18, 2017) ........................... 22

*Law Firm of Daniel P. Foster, P.C. v. Turner Broadcasting System, Inc.*,
    844 F.2d 955 (2d Cir. 1988) ................................................................................ 17

*Lee v. TMZ Productions Inc.*,
    No. 2:15-cv-00234, 2015 WL 5638081 (D.N.J. Sept. 24, 2015) ........................... 17

*Lemelson v. Bloomberg L.P.*,
    903 F.3d 19 (1st Cir. 2018) .................................................................................. 23

*Lieberman v. American Dietetic Association*,
    No. 94-cv-5353, 1996 WL 490779 (N.D. Ill. Aug. 23, 1996) ............................... 20

*Lokhova v. Halper,*
    995 F.3d 134 (4th Cir. 2021) ............................................................................. 28

*Love v. Rehfus,*
    946 N.E.2d 1 (Ind. 2011) .................................................................................. 20

*McCabe v. Rattiner,*
    814 F.2d 839 (1st Cir. 1987).............................................................................. 32

*McDonald v. Raycom TV Broadcasting, Inc.,*
    665 F. Supp. 2d 688 (S.D. Miss. 2009) ........................................................... 17

*McFarlane v. Sheridan Square Press, Inc.,*
    91 F.3d 1501 (D.C. Cir. 1996)........................................................................... 24

*Moore v. University of Notre Dame,*
    968 F. Supp. 1330 (N.D. Ind. 1997) ................................................................ 21

*National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.,*
    705 F.2d 98 (4th Cir. 1983) ............................................................................... 19

*National Police Association v. City of Trenton,*
    No. 19-008837-CZ, slip op. (Cir. Ct. Mich. Mar. 3, 2020) ............................ 14

*Nelson v. Associated Press, Inc.,*
    667 F. Supp. 1468 (S.D. Fla. 1987) ................................................................. 31

*New York Times Co. v. Connor,*
    365 F.2d 567 (5th Cir. 1966) ............................................................................. 22

*New York Times Co. v. Sullivan,*
    376 U.S. 254 (1964)............................................................................................ 19

*Newton v. National Broadcasting Co.,*
    930 F.2d 662 (9th Cir. 1990) ............................................................................ 21

*Open Source Sec., Inc. v. Perens,*
    803 F. App'x 73 (9th Cir. 2020) ....................................................................... 35

*Pack v. Middlebury Community Schools,*
    990 F.3d 1013 (7th Cir. 2021) ......................................................... 3, 27, 28, 30

*Pack v. Truth Publishing Co., Inc.,*
    122 N.E.3d 958 (Ind. Ct. App. 2019) .............................................................. 25

*Paterson v. Little, Brown & Co.,*
    502 F. Supp. 2d 1124 (W.D. Wash. 2007)....................................................... 33

*Patten v. Smith*,
   360 N.E.2d 233 (Ind. Ct. App. 1977) ................................................................ 16

*Piccone v. Bartels*,
   785 F.3d 766 (1st Cir. 2015) ........................................................................... 34

*Pippen v. NBCUniversal Media, LLC*,
   734 F.3d 610 (7th Cir. 2013) ........................................................ 18, 24, 26, 27, 28

*Pope v. Chronicle Publishing Co.*,
   95 F.3d 607 (7th Cir. 1996) ............................................................................ 32

*Pope v. The Chronicle Publishing Co.*,
   891 F. Supp. 469 (C.D. Ill. 1995) .................................................................... 23

*Price v. County of Los Angeles*,
   No. 2:20-cv-04911, 2020 WL 7861975 (C.D. Cal. Dec. 1, 2020) .......................... 5

*Reilly v. Associated Press*,
   797 N.E.2d 1204 (Mass. App. 2003) ................................................................ 31

*Salzano v. North Jersey Media Group Inc.*,
   993 A.2d 778 (N.J. 2010) ............................................................................... 16

*Seidl v. Greentree Mortgage Co.*,
   30 F. Supp. 2d 1292 (D. Colo. 1998) ............................................................... 33

*Stebbins v. State Farm Mutual Automobile Insurance Co.*,
   413 F.2d 1100 (D.C. Cir. 1969) ................................................................ 14, 15

*Stevens v. Tillman*,
   855 F.2d 394 (7th Cir. 1988) .......................................................................... 34

*Sullivan v. American Casualty Company of Reading, Pennsylvania*,
   605 N.E.2d 134 (Ind. 1992) ............................................................................ 13

*Tacket v. General Motors Corp.*,
   836 F.2d 1042 (7th Cir. 1987) .................................................................. 29, 30

*Taub v. McClatchy Newspapers, Inc.*,
   504 F. Supp. 2d 74 (D.S.C. 2007) ................................................................... 29

*Trexler v. The Association Press*,
   No. 2010CP401249, 2013 WL 9963459 (S.C.Com.Pl. Apr. 30, 2013) .................. 30

*Two Jinn, Inc. v. Green*,
   No. 1:06-cv-268, 2007 WL 1381804 (D. Idaho Mar. 7, 2007) ............................ 33

*U.S. ex rel. Ceas v. Chrysler Grp. LLC,*
  78 F. Supp. 3d 869 (N.D. Ill. 2015) ................................................... 5, 9

*U.S. v. Bowser,*
  No. 1:12-cr-00102, 2015 WL 2449771 (S.D. Ind. May 20, 2015) ........................................... 10

*Uhler v. Galesi Management Corp.,*
  No. 3:98-cv-0005, 1999 WL 20949 (N.D. Tex. Jan. 8, 1999)................................................... 33

*Walton v. Springmill Streams Homeowners Association,*
  No. 1:09-cv-1136, 2010 WL 5126368 (S.D. Ind. Dec. 9, 2010) ............................................. 12

*Whyte v. American Board. of Physical Medicine & Rehabilitation,*
  393 F. Supp. 2d 880 (D. Minn. 2005)................................................................................... 23

*Winn v. Associated Press,*
  903 F. Supp. 575 (S.D.N.Y. 1995) ................................................................................. 30, 31

*Winn v. United Press Int'l,*
  938 F. Supp. 39 (D.D.C. 1996)................................................................................................ 31

*Woods v. Evansville Press Co.,*
  No. EV 81-263-C, 1985 U.S. Dist. LEXIS 23754 (S.D. Ind. Apr. 17, 1985) ......................... 18

**Statutes**

47 U.S.C. § 230.......................................................................................................................... 29

Ind. Code Ann. § 34-11-2-4 ..................................................................................................... 12

**Other Authorities**

Alfred Hill, *Defamation and Privacy Under the First Amendment,*
  76 Colum. L. Rev. 1205 (1976) ........................................................................................... 35

Restatement (Second) of Torts § 566 (1977)............................................................................ 34

Restatement (Second) of Torts § 577 (1977)............................................................... 28, 29, 30

Restatement (Second) of Torts § 577A (1977) ............................................................. 25, 26, 28

Restatement (Second) of Torts § 611 (1977)............................................................................ 16

Sack on Defamation § 7.2.2 (5th Ed. April 2021) ................................................................... 27

**Rules**

Fed. R. Civ. P. 41(b) ................................................................................................................ 14

Michigan's Civil Rule 2.504 ................................................................................................... 14

## **INTRODUCTION**

Plaintiff "National Police Association" ("NPA") is seeking to hold the press liable for publishing articles about "scam alerts" and warnings—issued by multiple police departments to protect their communities from what these police departments believed to be NPA's aggressive and misleading fund raising tactics. NPA's defamation suit is an affront to the freedom of the press, the First Amendment, and, indeed, to the very police departments doing their jobs to protect their residents that NPA *purports* to support. NPA's complaint should be dismissed with prejudice for failure to state a claim.

Aside from being time barred, NPA's defamation claim against Defendants Gannett Co., Inc. ("Gannett"), whose newspaper the *Indianapolis Star* (the "*IndyStar*") published two of the articles at issue,[1] and The Associated Press, Inc. (the "AP"), a wire service that re-published portions of the first *IndyStar* article, fails because the press is privileged to report on statements and warnings issued by public officials, like the police. The chilling effect and public harm if the press could be held liable for disseminating public warnings by the police or other government officials would be massive: suspects could not be described and health warnings about products could not be issued without fear of suit.[2]

---

[1] The complaint alleges (at ¶ 7) that Gannett "is a holding company that owns *Indianapolis Star*." In truth, the newspaper is owned by a different entity, which Gannett owns through intermediaries. This distinction does not impact this motion, which accepts NPA's allegation as true, and this brief treats the *IndyStar* and Gannett as synonymous terms.

[2] There are three articles at issue. (Compl. Exs. 1-3.) The *IndyStar* published Exhibit 1 on March 18, 2019. Exhibit 2 was published by the AP the day after, when its wire service picked up the *IndyStar* article. The *IndyStar* published Exhibit 3 after NPA sued the police for statements reported in the first *IndyStar* article. With respect to the arguments that follow, NPA's claim fails as to Exhibits 1 and 2 because it is time barred. NPA's claim against both Defendants also fails as to all three articles because: (i) NPA is collaterally estopped as it already sued the police for making the statements and lost; (ii) Defendants were privileged to report on police statements and legal proceedings; (iii) there are no allegations of actual malice; and (iv) the statements were non-actionable opinions. Further, as to Exhibit 2, the AP is not liable because the wire-service defense permitted it to republish the *IndyStar's* published statements.

Even were the publications not privileged, NPA's complaint should be dismissed because it makes no allegation that the articles were published with actual malice.  Put another way, there are no allegations that the *IndyStar* or the AP believed the police were lying or acted with reckless disregard for the truth when they reported on consistent warnings, issued by multiple unrelated police departments (credible sources), about NPA's fundraising tactics.  Quite the opposite, the articles confirm that the *IndyStar* not only sought comment from and published NPA's responses to the police warnings, but also investigated the organization independently and uncovered red flags, such as one of NPA's publicly-disclosed officers claiming to have never been involved with the organization.  The article further shows that the *IndyStar* spoke with Professor Levine Daniel, at Indiana University, and reported her analysis of NPA's public tax returns which was not negative as to NPA.  Likewise, there is no allegation that the AP believed the *IndyStar* article was untrue when it republished the statements of police officers through its wire service, and wire services acting in such a capacity are shielded from liability under the wire-service defense.

NPA well knows its claim is doomed under existing law, which is why its complaint devotes almost 20 paragraphs entitled "Law" arguing for a novel "continuing publication" theory of defamation that would hold online publishers liable indefinitely if they choose not to remove a website news article that—though believed true when published—subsequently is claimed to be inaccurate in some way.  In effect, under NPA's continuing-publication theory, even if there were no actual malice at the time of original publication, a plaintiff could sue a defendant for actual malice later due to its failure to retract the publication, eviscerating bedrock defamation law that there is no duty to retract and destroying any statute of limitations.

2

Setting aside that NPA hasn't adequately alleged that the *IndyStar* or the AP believe the articles are false today or are currently acting with reckless disregard (just as NPA has not alleged actual malice at the time of first publication), the "continuing publication" theory has been rejected in almost every U.S. jurisdiction to have considered the issue. And the Seventh Circuit recently predicted that if faced with the question, Indiana would join the "vast majority" and reject it as well. *Pack v. Middlebury Comm. Schools*, 990 F.3d 1013, 1021 (7th Cir. 2021) ("We conclude that the Indiana Supreme Court would conclude that the press release is not a new statement each time someone accesses it on the School's website.").

NPA's defamation suit fails for another reason. Calling something a "scam" is textbook opinion or hyperbole and is not actionable. That point is buttressed here because the article published, in its entirety, NPA's fundraising letters that the police described as being "scams." Doing so allowed readers to make their own judgment as to the police's expressed opinions and warnings and rendered the police's description of the articles a non-actionable opinion based on fully disclosed facts.

Though any of these deficiencies are independently fatal, NPA's complaint also fails out of the gate for a more mundane reason: collateral estoppel. The National *Police* Association was so desperate to prevent the public from knowing about the police departments' warnings, as quoted by Defendants, that it sued the very police departments and individual officers its mission purports to support, claiming defamation and myriad other counts. In its only suit against the police that was not settled, NPA lost. Its claims were dismissed *on the merits and with prejudice* as a terminating sanction when NPA refused to obey a court order compelling it to provide discovery. Collateral estoppel precludes NPA from suing Defendants for reporting on the very same speech by the police for which NPA has already sued and lost.

## RELEVANT FACTS

### A.   The National Police Association.

NPA is a 501(c)(3) corporation that is "supported solely through contributions" and its

fundraising efforts, which are the subject of Defendants' news reports.  (Compl.  ¶ 7 [ECF

No. 1].)  NPA's purported mission "is to educate supporters of law enforcement in how to help

police departments accomplish their goals."  (*Id.* ¶ 6.)  Despite that mission, NPA has repeatedly

sued or threatened police departments that expressed concerns over its fundraising practices, *e.g.*:

- *National Police Association, Inc. v. City of Trenton [and two of its police officers]* (Wayne Mich. Cir.Ct. No. 19-008837-CZ); and

- *National Police Association, Inc. v. Village of Germantown [and its Chief of Police]* (Marion Ind. Super.Ct. No. 49D14-2009-PL-030208, *rem'd* to S.D.Ind. No. 1:20-cv-2569).

### B.   Multiple police departments issued warnings about NPA to the public.

In 2018 and 2019, police departments across the country expressed concerns about

fundraising letters NPA sent to residents of their communities.  (Compl. ¶ 12.)  In 2018, for

example, the Germantown, Wisconsin Police posted a "Scam Alert" to its Facebook page:



4

The alert is no longer available online but was an exhibit to NPA's suit against the Germantown police. A copy of NPA's complaint against the Germantown police is attached as Exhibit A.[3]

Subsequently, in February 2019, the Trenton, Michigan Police issued a similar Facebook warning:

> Scam Alert! Warning to residents! You may be receiving this in the mail. It is a request for money from the "National Police Association." They are using the Trenton Police and "Trenton Area" in the donation line. The City of Trenton and Trenton Police Department are in No Way affiliated with this organization and do not endorse this campaign. Make sure to always do your homework when donating to any cause or activity.

As with the Germantown police alert, this warning is not currently available online but is quoted in NPA's suit against the Trenton police. A copy of NPA's complaint against the Trenton police is attached as Exhibit B, and the scam alert is quoted in paragraph 13.[4] The Belle Isle, Florida Police, also issued a similar scam alert as referenced in NPA's complaint. (Compl. ¶ 110.)

These police departments were by no means alone. A non-exhaustive online search confirms that at least seven other unrelated police departments have published similar scam alerts to the public both before and after the newspaper articles in question were published:

- The Kingston, Pennsylvania Municipal Police Department on August 22, 2018, issued a "scam alert," showing an image of NPA's letter and stating that "This solicitation was not authorized by The Municipality of Kingston and at this time should be considered a scam." (Ex. C.[5])  https://www.facebook.com/kingstonmunicipalpolicedept/photos/

---

[3] The Court can consider these police-issued alerts without converting to a motion for summary judgment, because they are referenced in NPA's complaint, in the articles attached to the complaint, and are central to NPA's claims. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *Burlet v. Baldwin*, 452 F. Supp. 3d 801, 812 (N.D. Ill. 2020) (considering materials to get "full context" to dismiss defamation claim). The Court can also consider material that is subject to judicial notice, *id.*, which includes the police alert because it is sourced from NPA's complaint against the Germantown police. *U.S. ex rel. Ceas v. Chrysler Grp. LLC*, 78 F. Supp. 3d 869, 873 (N.D. Ill. 2015) (court can take judicial notice of "public court documents"). The Court can also take judicial notice of the alerts because they were posted on the police departments' official Facebook or Twitter pages. *Price v. Cty. of Los Angeles*, No. 2:20-cv-04911, 2020 WL 7861975, at *2 (C.D. Cal. Dec. 1, 2020).

[4] The Court can consider the Trenton alert for the same reasons as the Germantown police alert.

[5] As noted, courts can take judicial notice of posts made by government officials on their Facebook and Twitter pages. *E.g.*, *Price*, 2020 WL 7861975, at *2. Moreover, this is the

a.722945947751379/1846969212015708/?type=3&theater (must login to Facebook to view).

- The Police Department for Storm Lake, Iowa, on February 11, 2019, stated that NPA letters were a "scam" and a "ruse" "using scare tactics" to obtain donations and also stating that the police department was not affiliated with NPA.  (Ex. D.)  https://www.facebook.com/permalink.php?story_fbid=2592040494171009&id=145014222206994

- The Town of Mancos, Colorado Marshal's Office, on March 21, 2019, likewise issued an alert calling the letters a scam that "uses language to scare victims into giving the persons or organization money." (Ex. E.)  https://www.facebook.com/permalink.php?story_fbid=2170853523002333&id=121768284577544

- The Granville, Massachusetts Police Department, on November 3, 2019, issued an alert describing NPA letters as a "POSSIBLE SCAM," noting NPA had no affiliation with the police department.  (Ex. F.)  https://www.facebook.com/GranvilleMAPD/posts/2491576717728456/

- The Buckland, Massachusetts Police Department, on December 8, 2020, issued a "SCAM ALERT" concerning NPA's fundraising letters.  (Ex. G.)  https://www.facebook.com/permalink.php?story_fbid=3535645169844967&id=598223973587116 (must login to Facebook to view).

- The Lubbock, Texas Police Department, on November 16, 2020, posted a "SCAM ALERT" on its twitter account regarding NPA's fundraising.[6]  (Ex. H.)

- The Swanton, Ohio Police Department, on December 18, 2020, also issued a similar "SCAM ALERT!"  (Ex. I.)  https://www.facebook.com/permalink.php?story_fbid=3595634023864516&id=894173164010629

### C.   The March 17, 2019 *IndyStar* article; Wire publication by AP.

"On March 17, 2019, the *Indianapolis Star*, a news publication employing both online and print media, published on its website, a well-known and widely read news source, an article about NPA." (Compl. ¶ 10.)  This article is attached as Exhibit 1 to the Complaint and is headlined, "This Indianapolis charity says it helps police. Police chiefs say it's a scam." (*Id.*)  A more legible and more complete copy (which includes the NPA's fundraising letters) may be

---

"fourth" police department referenced in the articles and in NPA's Complaint (at ¶ 12) and can be considered for that reason as well. *Geinosky*, 675 F.3d at 745 n.1.

[6] The original is not available, but is captured in news reports: https://www.msn.com/en-us/news/us/letter-asking-for-donations-for-national-police-association-is-a-scam-lpd-says/ar-BB1b4dj5

found on the newspaper's website: https://www.indystar.com/story/news/investigations/2019/03/17/national-police-association-says-its-helping-police-chiefs-say-its-scam/3144585002/.

The article states that NPA had solicited donations through letters and that at least four police departments in four states have found the letters to be confusing enough to issue "scam alerts" in their communities.  The article quoted Germantown's Chief of Police Hoell; the Belle Isle Chief of Police; and Trenton Police Lieutenant Hawkins regarding their concerns over NPA and its fundraising letters.  (Compl. Ex. 1 at PageID# 31, 35, 37.)

As reported, the primary concern expressed by these police departments was that NPA's letters would confuse residents into wrongly believing these local police had their hands tied by "sanctuary city" policies or otherwise needed help, but that no NPA funds were ever given to these police departments.  The article quotes Trenton Police Lt. Hawkins explaining: "I'm thinking, 'What the hell is this, using our name and our police department to raise funds?  Get out of here." (*Id.* at PageID# 31.)  Similarly, the article quoted Germantown Police Chief Hoell scoffing at any solicitation tied to purported sanctuary city policies in his community: "[NPA] must not have researched the demographics.  It's so far-fetched, especially if you know Germantown.  It's a highly conservative community.  It's a scam.  It's no different than any other scam – just a different angle." (*Id.* at PageID# 35.)

The first *IndyStar* article further reported that Hoell stated he had reported NPA's activities to the U.S. Postal Inspection Service "over what he considered to be fraudulent mail" but that he typically does not receive any response from the Service.  (*Id.*)

The first *IndyStar* article also quoted Belle Isle Police Chief Houston as stating her belief that the NPA letter contained "pleas to those who are easily preyed upon," noting Belle Isle's large population of elderly residents whom she was trying to protect.  The article describes

7

Police Chief Houston's further explanation that she had attempted to contact NPA but was forced to leave a voicemail that was never returned.  The Police Chief stated that in light of her inability to gain the information she needed to "substantiate that this is a legitimate organization," in her judgment it was "enough for me to recommend our residents not send something out."  (*Id.* at PageID# 37-38.)

In addition to describing the police departments' concerns, the article makes clear that the *IndyStar* sought out and presented NPA's position and responses.  The article confirms that the *IndyStar* reached out to NPA's President, Eddie Hutchison—who the article explains also worked at the Indiana Attorney General's Office "as a fraud investigator"—but he "did not agree to an interview request."  (*Id.* at PageID# 31.)  The article also confirms that the *IndyStar* communicated with NPA's treasurer *and attorney* Derek Peterson, and the article presented Mr. Peterson's statements that NPA was "not a scam," "does not misrepresent itself," and uses a third-party vendor to conduct its fundraising.  (*Id.* at PageID# 32, 36.)  The article reported Peterson's statement that both NPA and its vendor "comply with the law" and that the police departments' concerns were "unfair and unsubstantiated."  (*Id.* at PageID# 37.)  The article also sets forth the efforts that the *IndyStar* took to identify and contact other purported officers of NPA (as listed on public filings), many of whom could not be located, and one of which denied ever being involved with NPA at all.  (*Id.* at PageID# 31, 40-41.)

The article also reported NPA's statement that "it generally does not donate to police departments," but provided an example of how it had given $1,000 worth of brochures to a police department in Dane County, Wisconsin.  The article quoted the Dane County Sheriff as being "pleasantly surprised" by NPA's assistance and having stated that "it worked out nicely." (*Id.* at PageID# 38.)

8

The following day, on March 19, 2019, the AP—a nonprofit news wire service—picked up the report by the *IndyStar* and published an article summarizing its reporting and quotations entitled, "Police question authenticity of nonprofit's fundraising."  A copy of the AP article is attached as Exhibit 2 to the Complaint and can also be found on the AP's website: https://apnews.com/article/41034ee39fdf468c9bb1fc703bce0882.

NPA's Complaint does not allege that the first *IndyStar* article was materially inaccurate in any way in quoting either the police statements and warnings or the NPA's responses to those stated opinions.  Likewise, NPA's Complaint does not allege that the AP's article in any way misstates or changes the gist of the first *IndyStar* article.

**D.     NPA sues Trenton Police; The *IndyStar* July 15, 2019 article reports the suit.**

After the first *IndyStar* article was published, NPA and its President Hutchison, on June 26, 2019, sued the City of Trenton, as well as its Chief of Police Todd Scheffler and Police Lieutenant Mike Hawkins individually. (*See* NPA's Complaint against Trenton police, attached as Exhibit B.[7])  NPA's Trenton lawsuit alleged the police's scam alert, as referenced in the first *IndyStar* article, was defamatory.  (Ex. B ¶ 13.)  NPA further claimed that the statements made to the *IndyStar* by the Trenton police, as published in the first *IndyStar* article, were defamatory. (*Id.* at ¶¶ 14-21.)  The complaint also alleged that Hutchison, NPA's President, "was terminated from his position as [fraud] Investigator for the Office of the Indiana Attorney General by his employer, the State of Indiana" as a result of the police statements.  (*Id.* ¶ 35.)

Following this lawsuit, the *IndyStar* published a second article on July 15, 2019, entitled "A pro-police Indianapolis nonprofit is suing 2 police officers." (Compl. ¶ 48.)  A copy of this

---

[7] As noted above, "[a] district court is also permitted to take judicial notice of public documents, including public court documents, while considering a motion to dismiss under Rule 12(b)(6)." *Chrysler Grp.*, 78 F. Supp. 3d at 873.

article is attached as Exhibit 3 to the Complaint and can be found online.[8]  This second *IndyStar*

article relied on and quoted from NPA's public lawsuit, as well as NPA's press release

describing the lawsuit and its reasons for bringing suit, which the *IndyStar* linked to directly.[9]

(Compl. Ex. 3 at PageID# 53.)  As the article described, NPA's contention was that the

fundraising letters never expressly promised that local police would receive money from

donations, so they were not really "scams."  (*Id.* at PageID# 57.)  The *IndyStar*'s second article

also quoted Michigan State University law professor Nancy A. Costello (*id.*), who explained that

the point of such suits was not always to succeed in the courtroom:

> Sometimes they bring defamation lawsuits to silence the speech because they don't
> like the speech.  They want to discourage this speech.  That's why people bring
> defamation lawsuits.

> While again declining to be interviewed, the second *IndyStar* article also reported that

NPA's President Hutchison emailed the *IndyStar* to ask whether its reporting on the Trenton

Police's statements were due to "malice or negligence?"  (*Id.* at PageID# 58.)

> As with the first *IndyStar* article and the AP article, NPA's complaint does not allege that

the second *IndyStar* article was in any way incorrect in quoting either the police's statements and

warnings, NPA's statements, or in summarizing NPA's lawsuit.

> NPA's suit against the Trenton Police—targeting the same statements at issue in the

*IndyStar* and AP articles—was dismissed on the merits and with prejudice when NPA refused to

comply with the court's order to provide discovery.  A copy of the dismissal-with-prejudice

order and underlying hearing transcript are attached, respectively, as Exhibits J and K.[10]

---

[8] https://www.indystar.com/story/news/investigations/2019/07/15/national-police-association-suing-two-trenton-police-officers-michigan/1696197001/

[9] NPA's internet release repeats the same statements it alleges are defamatory: https://national police.org/national-police-association-files-defamation-suit-in-response-to-fake-news-story/

[10] The court may take judicial notice of a state court order and hearing transcript.  *U.S. v. Bowser*, No. 1:12-cr-00102, 2015 WL 2449771, at *1 (S.D. Ind. May 20, 2015).

E.      **Some police departments issue letters or update their alerts.**

Following NPA's aggressive litigation, which targeted not only police departments, but also officers in their individual capacities, Germantown wrote a letter to NPA. (Compl. Ex. 4.) Germantown's letter confirmed: (i) NPA was registered with the IRS; (ii) Germantown "is not a sanctuary city" but is technically part of the Milwaukee metropolitan area, whose "public school policy" is not to cooperate with ICE; and (iii) Germantown is not affiliated with NPA and does not receive financial support from NPA.  While NPA's complaint (¶ 65) describes this as a "retraction," Germantown's letter never said that NPA's fundraising efforts were not scams, and never said that NPA's letter was not misleading.  In fact, by emphasizing that Germantown was not a sanctuary city and that NPA did not help Germantown police, it confirmed the police's original concerns, as reported by the *IndyStar* and the AP.  (*See* Compl. Ex. 4 at PageID# 60.)

Similar statements were posted by Trenton (Exhibit 5) and Belle Isle (Exhibit 6).  These were not retractions either.  Rather, both continued to warn residents that the local police would not benefit from the donations, with Trenton expressly cautioning residents to "do your own homework" before donating to any charity.  NPA provided copies of these statements to Defendants on February 19, 2021.  (Exs. 7, 9.)

## ARGUMENT

"Because a defamation suit may be as chilling to the exercise of First Amendment freedoms as fear of the outcome of the lawsuit itself, courts should, where possible, resolve defamation actions at the pleading stage.  *Adelson v. Harris*, 973 F. Supp. 2d 467, 481 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017).

To survive a motion to dismiss, NPA was required to plausibly plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009).  "Where a complaint pleads facts that are

merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* While the Court must accept NPA's factual allegations as true for purposes of this motion, it need not credit "legal conclusions" or "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Walton v. Springmill Streams Homeowners Ass'n*, No. 1:09-cv-1136, 2010 WL 5126368, at *1 (S.D. Ind. Dec. 9, 2010) (quoting *Iqbal*, 556 U.S. at 663-64 (2009)). Likewise, the Court should not credit NPA's allegations that are contradicted by the exhibits attached to the complaint. *Abcarian v. McDonald*, 617 F.3d 931, 933 (7th Cir. 2010) ("[T]he exhibits trump the allegations.").

In addition to proper allegations, the Court can consider materials referenced in the complaint or of which judicial notice would be proper without converting the motion into one for summary judgment. *Geinosky*, 675 F.3d at 745 n.1 ("A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice.").

I.  **NPA's claim arising out of the first *IndyStar* article and AP article is time-barred.**

"Indiana has a two-year limitations period for defamation claims." *Jean v. Dugan*, 20 F.3d 255, 262 (7th Cir. 1994); Ind. Code Ann. § 34-11-2-4 (formerly § 34-1-2-2). The first *IndyStar* article was published on March 17, 2019 (Compl. ¶ 10), and the AP article was published on March 18, 2019 (*id.* ¶ 30), two years and two months before this suit was brought. These articles make clear that NPA was, at the time, asked to comment on the very police department statements it now contends are defamatory. Indeed, Hutchison—NPA's President who verified the complaint in this action—was, prior to publication in March of 2019, offered an opportunity to be interviewed and instead directed his attorney to respond to the police departments' concerns. As stated in the article:

12

Hutchison did not agree to an interview request.  But several IndyStar questions sent to Hutchison were answered through a local attorney, Derek R. Peterson, who is listed as the nonprofit's treasurer.  Peterson also previously worked for the Indiana attorney general.  (Compl. Ex. 1. PageID# 31; *accord* Ex. 2 PageID# 47.)

Instead of timely suing Defendants for these publications, which NPA disagreed with at the time, NPA instead sued multiple police departments directly, and each of NPA's complaints against those police departments referenced the *IndyStar* article.  Those suits failed to produce real retractions, and one was dismissed on the merits.  While this suit is yet another attempted bite at the apple on the heels of NPA's prior legal failures, it is time-barred and must be dismissed.

## II.   The prior dismissal on the merits of NPA's Trenton suit dooms NPA's suit here under principles of collateral estoppel and issue preclusion.

"Collateral estoppel operates to bar a subsequent relitigation of the same fact or issue where that fact or issue was necessarily adjudicated in a former suit and the same fact or issue is presented in the subsequent lawsuit.  In that situation, the first adjudication will be held conclusive even if the second action is on a different claim."  *Sullivan v. Am. Cas. Co. of Reading, Pa.*, 605 N.E.2d 134, 137 (Ind. 1992); *accord Johnson v. Bd. of Sch. Comm'rs of City of Indianapolis*, No. 1:09-cv-574, 2010 WL 4097149, at *1 (S.D. Ind. Oct. 6, 2010) ("defensive" collateral-estoppel bar applies "when the defendant seeks to prevent a plaintiff from asserting a claim which the plaintiff had previously litigated and lost against another defendant.").

Indiana follows the "modern view" of collateral estoppel and does not require privity, identity of the parties, or mutuality.  *Sullivan*, 605 N.E.2d at 137.  Rather, "the prime consideration is whether the party against whom the prior judgment is pled had a full and fair opportunity to litigate the issue and whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel."  *Id.* at 138.  Here, there is no doubt that NPA had the full and fair opportunity to litigate its defamation claim in its suit against Trenton,

which raised almost identical claims as this suit does, and which was based on the very conduct

and statements reported by the *IndyStar* and the AP.

At its heart, NPA's Trenton suit (Exhibit B hereto) alleged that the "Scam Alert" issued

by the police about NPA was defamatory because NPA is not a scam.  NPA's suit further alleged

that statements made by the police, *which NPA obtained and quoted from* the *IndyStar article*,

were defamatory because they falsely implied NPA's fundraising letters were misleading.  In

short, NPA's Trenton defamation suit quoted from the very articles at issue in its suit here

against Gannett and the AP and targeted the very same statements—that NPA was a scam that

targets local residents but does not help local police.

Despite commencing the Trenton suit, NPA resisted providing discovery.  It lost a motion

to compel, and then the court dismissed NPA's suit "with prejudice" when it refused to obey that

discovery order.  (Exs. J-K.)  Similar to Fed. R. Civ. P. 41(b), Michigan's Civil Rule 2.504(B)(3)

provides that such a dismissal "operates as an adjudication on the merits."  *See Stebbins v. State

Farm Mut. Auto. Ins. Co.*, 413 F.2d 1100, 1102 (D.C. Cir. 1969) ("[S]ince it did not specify

otherwise, the dismissal was an involuntary one under Rule 41(b), Fed.R.Civ.P., which provides

that such a dismissal (for failure to comply with an order of the court) 'operates as an

adjudication upon the merits.'").

Courts routinely apply a collateral estoppel bar in the case of terminating discovery

sanctions—such as the one entered against NPA—and will not credit a sanctioned party's

argument that its own misconduct precluded the issues from being "actually litigated" or

"necessarily adjudicated."  *E.g., In re Docteroff*, 133 F.3d 210, 215 (3d Cir. 1997) ("We do not

hesitate in holding that a party such as Docteroff, who deliberately prevents resolution of a

lawsuit, should be deemed to have actually litigated an issue for purposes of collateral estoppel

14

application."). *Docteroff*, as here, involved a party who had a judgment entered against it as a discovery sanction. As the Third Circuit explained, to not apply collateral estoppel "would encourage behavior similar to Docteroff's and give litigants who abuse the processes and dignity of the court an undeserved second bite at the apple." *Id.* ("In doing so, we join with Ninth and Eleventh Circuit courts of appeals in holding that, under these circumstances, the actual litigation requirement is met."); *accord Stebbins*, 413 F.2d at 1102 (applying res judicata bar where first suit dismissed for failure to comply with deposition order); *In re Hodges*, 271 B.R. 347, 354 (Bankr. N.D. Iowa 2000) (concluding, based on federal precedent and despite absence of state decisions, that Iowa would give terminating discovery sanctions "collateral estoppel effect").

NPA had its bite at the apple when it sued Trenton for defamation for issuing a scam alert and for statements its police officers made to the *IndyStar* that appeared in each of the articles at issue here. NPA lost on the merits after disobeying that court's order to provide discovery. It would be strange indeed if NPA could sue Gannett and the AP for reporting on concerns raised by police, when a court has already ruled, on the merits and with prejudice, against NPA's claims that the police's statements were defamatory. That is not the law, and collateral estoppel bars NPA from relitigating those issues again in this suit.

## III.  Defendants were privileged to report the allegedly defamatory statements of police officers.

NPA believes it can sue news providers for informing the public about (i) warnings issued by police, and (ii) a public legal action commenced by NPA against the police. The public's overwhelming interest in learning about such events, however, precludes liability and renders Defendants' publications privileged.

Under hornbook law, "[t]he publication of defamatory matter concerning another in a report of an official action or proceeding or of a meeting open to the public that deals with a

matter of public concern is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported."  Restatement (Second) of Torts § 611 (1977).  This privilege— sometimes called "fair report"—has been widely adopted by at least 47 states.  *Salzano v. N. Jersey Media Grp. Inc.*, 993 A.2d 778, 786 n.2 (N.J. 2010) (collecting authority).  Indiana is one of them, recognizing that "[t]he dissemination of news by the communications media has traditionally been safeguarded by … [t]he privilege attached to the reporting of public proceedings."  *Patten v. Smith*, 360 N.E.2d 233, 236 (Ind. Ct. App. 1977).  Here, the privilege protects reporting on the police departments' issuance of alerts and statements (the subject of all articles) and NPA's lawsuit (the subject of the second *IndyStar* article).

Moreover, the "fair report" privilege is not limited to reports of judicial proceedings, and also protects the reporting of other "official actions" taken by governmental figures, including police departments' posting of the scam alerts and warnings.  Restatement (Second) of Torts § 611 cmt d. ("The filing of a report by an officer or agency of the government is an action bringing a reporting of the governmental report within the scope of the privilege.").  As the Supreme Court of Massachusetts recognized, the news media is thus privileged to report on governmental warnings "[w]hether the warnings are issued in a news release or in interviews with officials."  *Elm Med. Lab'y, Inc. v. RKO Gen., Inc.*, 532 N.E.2d 675, 678 (Mass. 1989) ("In this sense, the media are agents of the public and serve as its eyes and ears in matters of public concern.").  Similarly, Illinois has recognized that the privilege permits the press to report on statements made by police during interviews.  *Dolatowski v. Life Printing & Pub. Co.*, 554 N.E.2d 692, 694 (Ill. 1st Dist. 1990).  Likewise, the Eighth Circuit has found the press privileged to report on a kidnapping warning issued by the police that they were "on the lookout" for

plaintiff.  *Kenney v. Scripps Howard Broad. Co.*, 259 F.3d 922, 924 (8th Cir. 2001).  Indeed,

assisting the police in getting the word out assists their function in serving the public.  *Id.*

A media report is "fair" and privileged unless it "significantly changes the defamation

appearing in the governmental or public proceeding."  *Huon v. Denton*, 841 F.3d 733, 740 (7th

Cir. 2016).  Here, both the articles conveyed the gist of the police department scam alerts and

statements, with the first *IndyStar* article and AP article even providing direct links to the police-

issued warnings.  In fact, the police departments wanted their warnings published to their

communities to protect them from possibly making donations without understanding what they

were supporting.  Defendants are privileged to publish such information without risk of

defamation liability.

Similarly, the second *IndyStar* article accurately described NPA's lawsuit and the gist of

its claims.  Accordingly, even if the police statements were false as NPA alleges, Defendants

were privileged to and did accurately report on them.  *L. Firm of Daniel P. Foster, P.C. v.

Turner Broad. Sys., Inc.*, 844 F.2d 955, 961 (2d Cir. 1988) (publication of FBI statement

privileged); *Lee v. TMZ Prods. Inc.*, No. 2:15-cv-00234, 2015 WL 5638081, at *4 (D.N.J. Sept.

24, 2015) (publication of attorney general press conference statements privileged); *Kilgore v.

Younger*, 640 P.2d 793, 796-97 (Cal. 1982) (attorney general's holding press conference was in

furtherance of "official duty" and reporting was privileged); *McDonald v. Raycom TV Broad.,

Inc.*, 665 F. Supp. 2d 688, 690 (S.D. Miss. 2009) (press privileged to report (wrong) picture of

plaintiff provided by police stating he had committed crime); *Freedom Communs., Inc. v. Sotelo*,

No. 11-05-00336-CV, 2006 Tex. App. LEXIS 5132, at *10-11 (Tex. Ct. App. June 15, 2006)

(privilege to report on police press release incorrectly labeling plaintiff a sex offender).

Further, Defendants' publications are also privileged as "neutral reportage" as first established in *Edwards v. Nat'l Audubon Soc., Inc.*, 556 F.2d 113, 120 (2d Cir. 1977), which permits the media to report on "serious charges against a public figure"[11] made by a "responsible, prominent organization," multiple police departments in this case, "regardless of the reporter's private views regarding their validity." *Id.* ("What is newsworthy about such accusations is that they were made."); *Woods v. Evansville Press Co.*, No. EV 81-263-C, 1985 U.S. Dist. LEXIS 23754, at *13-15 (S.D. Ind. Apr. 17, 1985) (applying privilege).

Last, even when not strictly couched in terms of privilege, courts routinely hold that accurately publishing public warnings, allegations, or criticisms is not actionable.  For example, in *CanaRx Servs., Inc. v. LIN Television Corp.*, No. 1:07-cv-1482, 2008 WL 2266348, at *8 (S.D. Ind. May 29, 2008), defendant was not liable for reporting that "The FDA calls CanaRx: Illegal and dangerous" because the FDA had stated just that, so defendant's statement was true. Similarly, in *Croce v. New York Times Co.*, 930 F.3d 787, 794–95 (6th Cir. 2019), there was no liability where an article "reports newsworthy allegations with the appropriate qualifying language," just as Defendants have done here.

## IV.   NPA's defamation claim should be dismissed because it fails to allege actual malice "at the time" of the articles' publication.

### A.   NPA is a public figure and the articles are about public concerns, so NPA must plead actual malice.

NPA's claims should also be dismissed for failing to plead actual malice at the time of publication.  A public-figure plaintiff must allege actual malice to state a claim for defamation. *E.g.*, *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 614 (7th Cir. 2013).  Further, under

---

[11] As discussed in the following section, NPA is a public figure, and Indiana also requires even private plaintiffs to meet the same actual malice standard if the matter is of public concern.

Indiana law, even private plaintiffs must prove actual malice if the speech relates to a public

concern. *Filippo v. Lee Publications, Inc.,* 485 F. Supp. 2d 969, 973 (N.D. Ind. 2007).

Actual malice exists for a statement made "with knowledge that it was false or with

reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S.

254, 280 (1964). The standard is *subjective*, and "reckless disregard" requires a showing that a

defendant "actually had" "a high degree of awareness of probable falsity" by the publisher or

that the publisher actually "entertained serious doubts as to the truth of his publication." *Harte-*

*Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667 (1989).

NPA's complaint concedes that actual malice is required to prove defamation here.

(Compl. ¶¶ 99-101.) And for good reason. First, NPA is a public figure. It brings in millions of

dollars to finance its "mailings, national TV and radio public service announcements, legal

filings on behalf of [*and against*] police officers and agencies, original articles authored for NPA

by law enforcement experts, book publishing, and a pod cast, among other efforts." (*Id.* ¶ 6

(bracketed text added).) Courts routinely find charities and other corporations, like NPA, that

engage in solicitations and marketing activities to be public figures. *E.g., Nat'l Found. for*

*Cancer Rsch., Inc. v. Council of Better Bus. Bureaus, Inc*., 705 F.2d 98, 101 (4th Cir. 1983)

("The evidence is uncontroverted that the Foundation had thrust itself into the public eye.");

*Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) ("[The charities'] status as

'public figures' is irretractably admitted on the face of the complaint."); *Conseco Grp. Risk*

*Mgmt. Co. v. Ahrens Fin. Sys., Inc.*, No. 00 C 5467, 2001 WL 219627, at *10 (N.D. Ill. Mar. 6,

2001) (national marketing campaign rendered plaintiff public figure).

Even if NPA were not a public figure—and it is—actual malice is still required because

Defendants' speech involves a matter of public concern. "Speech is on a matter of public

concern if it is addressed to 'any matter of political, social, or other concern to the community,' as determined by its content, form, and context." *Love v. Rehfus*, 946 N.E.2d 1, 10 n.6 (Ind. 2011) (quoting *Connick v. Myers,* 461 U.S. 138, 146 (1983)). "In Indiana, the public interest is necessarily broad." *Filippo*, 485 F. Supp. 2d at 974 (collecting wide-ranging examples, from "entities serving the community" to more "lighthearted matters."). Under any standard, a matter of public concern certainly includes reporting on concerns, *voiced by police departments*, about a charity's questionable fundraising tactics. *Knight-Ridder*, 993 F.2d at 1092 n.4 (affirming that "the integrity of charities soliciting funds from the public" was of public concern); *see also Illinois, ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 623 (2003) ("Our decisions have repeatedly recognized the legitimacy of government efforts to enable donors to make informed choices about their charitable contributions.").

### B.      NPA does not and cannot allege actual malice at the time of publication.

To state a defamation claim, NPA was required to allege that Defendants acted with actual malice "at the time [they] published." *Lieberman v. Am. Dietetic Ass'n*, No. 94-cv-5353, 1996 WL 490779, at *2 (N.D. Ill. Aug. 23, 1996) (after-the-fact event "does not establish that [defendant] realized the inaccuracy at the time of publication") (citing *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 512 (1984)). NPA, however, makes no factual allegation that the *IndyStar* or the AP *subjectively and actually* harbored any doubt whatsoever—much less "serious doubts"—about the truth of the articles' contents at the time of the articles' publication on March 17, 2019, March 18, 2019, and July 15, 2019.

That is reason enough to dismiss NPA's complaint. And, indeed, the Fourth Circuit recently affirmed a Rule 12(b)(6) dismissal on this ground in *Fairfax v. CBS Corp.*, No. 20-1298, 2021 WL 2557891, at *5, --- F.3d ---- (4th Cir. June 23, 2021), holding that actual malice must be alleged to have existed "at the time of publication." *Id.* at *5. In *Fairfax*, CBS broadcast

20

interviews of two women who accused Virginia Lt. Governor Fairfax of sexual assault.  Fairfax

premised his defamation claim on CBS having not interviewed an eyewitness who would have

purportedly controverted the accuracy of the allegations.  *Id.* at *1-2, 5.  The Fourth Circuit

affirmed dismissal because Fairfax had not informed CBS of the existence of the eyewitness

until *after* the broadcast was aired and thus plaintiff "has not alleged that CBS had any reason, at

the time of the alleged defamatory statements, to believe that an eyewitness existed."  *Id.* at *5.

As in *Fairfax*, NPA has not alleged actual malice at the time of publication, but instead

ties its actual malice allegations to Defendants' inactions after the NPA provided them, nearly

two years later, with additional statements from the police.  (*See* Compl. ¶¶ 64-73, 118.)  And as

in *Fairfax*, that warrants dismissal here.  *See also Moore v. Univ. of Notre Dame*, 968 F. Supp.

1330, 1337 (N.D. Ind. 1997) (granting motion to dismiss because plaintiff's complaint "offered

no facts bearing on the dispositive issue" of actual malice); *Bolton v. Delta Air Lines*, 182 F.

Supp. 3d 768, 774 (S.D. Ohio 2016) (granting motion to dismiss: "Plaintiff does not allege facts

from which one could infer [Defendant] had any awareness of the probable falsity of the

statement or that she entertained serious doubts about the veracity of the statement."); *Biro v.

Conde Nast*, 963 F. Supp. 2d 255, 288 (S.D.N.Y. 2013) ("In short, missing from the complaint

are any factual allegations suggesting that Biro could plausibly demonstrate by clear and

convincing evidence that the New Yorker Defendants published the four allegedly defamatory

statements with actual malice.").

Moreover, it is clear that NPA could never make such an allegation of actual malice at

the time of publication.  First, the articles rely on statements by police officers, and courts

routinely find that such a reliance on credible sources precludes a finding of actual malice as a

matter of law.  *E.g.*, *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 682 (9th Cir. 1990) ("*New York*

*Times* and its progeny protect journalists and publishers from liability based on errors of fact that arise from reliance on a credible source."); *New York Times Co. v. Connor*, 365 F.2d 567, 576 (5th Cir. 1966) ("All that the evidence reveals is that Salisbury relied on one or two persons for each statement and that some of these people were actively involved in the events which were the subject of the article. This certainly does not constitute 'reckless disregard for the truth.'"); *Filippo*, 485 F. Supp. 2d at 974 (N.D. Ind. 2007) (actual malice not shown for publishing statements made by police; *Konrath v. Vance*, No. 16-cv-02784, 2017 WL 1382778, at *7 (S.D. Ind. Apr. 18, 2017) (no actual malice due to reliance on *police* and other "reliable sources"); *CanaRx*, 2008 WL 2266348, at *7, 9 (S.D. Ind. May 29, 2008) (no actual malice where news report about product's danger was based on "reliable source[]," namely the FDA).

For example, in *Barger v. Playboy Enterprises, Inc.*, 564 F. Supp. 1151, 1157 (N.D. Cal. 1983), *aff'd,* 732 F.2d 163 (9th Cir. 1984), the court concluded that there was no actual malice alleged where defendant relied on a *single* police officer as a source.  Here, by contrast, Defendants relied upon *multiple independent police departments across four states, Police Chiefs, and Police Officers*, all providing the same, consistent information as described in the articles.  Indeed, Germantown's alert had been published and unchallenged *for almost a full year* at the time of Defendants' publications.  NPA does not dispute that the police published the scam alerts and made the statements (in fact NPA sued the police for doing so), and the fact that those statements were made wholly precludes NPA from plausibly alleging actual malice by Defendants at the time of publication.[12]

---

[12] In addition to the police statements, the AP also relied on a credible source, the *IndyStar*.  As explained below in Section V, that also precludes liability under the wire-service defense.

<u>Second</u>, actual malice cannot be shown because Defendants presented NPA's position. Defendants had no obligation to interview NPA and experts, and could have simply published the police warnings without liability.  *See, e.g.*, *Pope v. The Chron. Pub. Co.*, 891 F. Supp. 469, 477 (C.D. Ill. 1995) ("[C]laims of defamation are not the proper mechanism to enforce balanced journalism"), *aff'd*, 95 F.3d 607 (7th Cir. 1996).  Nonetheless, the fact that Defendants did present the police's statements, the NPA's statements, and neutral analysis of professors further precludes a showing of actual malice.  *E.g., Franchini v. Bangor Publ'g Co. Inc.*, No. 1:18-cv-00015, 2020 WL 1879012, at *3 (D. Me. Apr. 15, 2020) (granting motion to dismiss: "The fact that Slack sought Plaintiff's comment, which was included in the article, and presented his version of events alongside that of the VA undermines any inference of actual malice."); *Lemelson v. Bloomberg L.P.*, 903 F.3d 19, 24 (1st Cir. 2018) (affirming Rule 12(b)(6) dismissal because defendant's attempt to interview plaintiff "tends to undercut any inference of actual malice"); *Whyte v. Am. Bd. of Physical Med. & Rehab.*, 393 F. Supp. 2d 880, 891 (D. Minn. 2005) (no actual malice where publication "presents both sides" of the situation); *Carr v. Forbes, Inc.*, 121 F. Supp. 2d 485, 495 (D.S.C. 2000) (no actual malice where plaintiff "interviewed people on both sides of the story"), *aff'd*, 259 F.3d 273 (4th Cir. 2001).

### C.    A failure to retract is insufficient to show actual malice and will not sustain a defamation claim.

Instead of alleging actual malice *at the time of publication*, NPA's only allegation regarding Defendants' "actual malice" (Compl. ¶ 118), as discussed above, is premised on Defendants' *subsequent refusal to remove and retract* the articles two years later, following NPA's February 19, 2021 demand for retractions (Compl. Exs. 7, 9), which attached the police departments' additional statements.  Even if the new police statements were "retractions"—and, as set forth above, it is clear from their face that they were not—they do not show Defendants

had serious doubt as to the truth of the police officer statements at the time they were published two years earlier, so they are irrelevant to alleging actual malice. *Fairfax*, 2021 WL 2557891 at *5.

Further, it is well established that there is no duty to retract a statement, and that a refusal to retract is insufficient to show an earlier statement was made with actual malice or to support a claim. *Pippen*, 734 F.3d at 614–15 (7th Cir. 2013) ("The Supreme Court also has said that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false."). Accordingly, in *Pippen*, plaintiff's alerting defendant to the falsity of a statement after it was published could not establish defamation. *Id.* Similarly, in *Biro*, the court dismissed under Rule 12(b)(6) a claim based on a failure to retract. Its rationale was that a refusal to retract— because it occurs after publication—offers "dubious at best" "probative value as to a defendant's state of mind *at the time* of publication." 963 F. Supp. 2d at 281-82 (emphasis added). As the court concluded, "a defendant's decision not to retract … is not in itself enough to nudge an allegation of actual malice from conceivable to plausible, especially in a case such as this, where the article itself has the facial appearance of reliability." *Id.* at 282. Likewise, in *Fairfax*, the Fourth Circuit concluded that dismissal was proper despite CBS's subsequent refusal to retract because "CBS's alleged post-publication conduct here is not probative of its state of mind at the time of publication, before it was aware of the alleged eyewitness." 2021 WL 2557891, at *5.

Other courts have held similarly. *E.g.*, *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("[Plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after publication."); *Green Grp. Holdings, LLC v. Schaeffer*, No. 16-cv-00145, 2016 WL 6023841, at *18 n.18 (S.D. Ala. Oct. 13, 2016) (granting

motion to dismiss because failing to correct or retract was insufficient to allege actual malice); *Pack v. Truth Publ'g Co., Inc.*, 122 N.E.3d 958, 969 (Ind. Ct. App. 2019) ("After-the-fact information that could not have played any part in the Newspaper's initial publication decision does not matter to [anti-slapp] analysis.").

### D. Indiana does not recognize a claim for "continued publication defamation;" the Seventh Circuit has predicted Indiana would apply the "single publication" rule, as virtually every other state has done.

Because NPA cannot allege actual malice or state a claim for defamation, it titles its only count "continued publication defamation" and asks this Court to revive a long-deceased theory of liability born of English common law and contrary to modern First Amendment protections and a functioning press.  In short, NPA alleges the February 19, 2021 demands for retractions should have caused Defendants to have serious doubts about the truth of the previously-published articles, and that Defendants should therefore be held liable for defamation for refusing to remove the articles from their websites.  As explained above, however, a refusal to retract is not actionable.  Neither is maintaining an article on a website.

NPA's claims are tied to a long-dead "multiple publication" rule inherited from English common law under which each new publication created new liability, such that if a defendant printed 50 copies of a book in 50 states, it could be sued 50 separate times.  Virtually every court to have considered the issue in modern times (since around the 1950s), however, has rejected the multiple publication rule in favor of a "single publication" rule that limits liability to a single claim arising out of defendant's first publication of allegedly defamatory material.  By 1984, the Supreme Court recognized that the "great majority of the States now follow the 'single publication rule'" as set forth in Restatement (Second) of Torts § 577A.  *Keeton v. Hustler Mag., Inc.*, 465 U.S. 770, 778 n.8 (1984) (citing Restatement).

25

Under Section 577A(3), a "single publication" is defined as "[a]ny one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication."  And as the Supreme Court explained in *Keeton*, the single publication rule can be summarized as:

> As to any single publication, (a) only one action for damages can be maintained; (b) all damages suffered in all jurisdictions can be recovered in the one action; and (c) a judgment for or against the plaintiff upon the merits of any action for damages bars any other action for damages between the same parties in all jurisdictions.

*Keeton*, 465 U.S. 770, 773 n.2 (1984) (quoting Restatement (Second) of Torts § 577A(4) (1977)).  Thus, under the single publication rule, Defendants' website articles are single publications, made on the day of their posting, not continuous republications that permit a new claim each time a new person views the webpage, so NPA's "continued publication defamation" claim fails.

**As the Seventh Circuit explained in *Pippen*, "[e]very state court that has considered the question applies the single-publication rule to information online [a]nd those federal courts that have addressed the topic have concluded that the relevant state supreme court would agree."**  734 F.3d at 615 (citations omitted).  There is a strong policy underlying such near-universal decisions because "excluding the Internet from the single-publication rule would eviscerate the statute of limitations and expose online publishers to potentially limitless liability."  *Id.*[13]

The single-publication rule was initially applied to newspaper publishers (who were done printing and distributing in a single day), but was then expanded to book publishers, despite

---

[13] Though *Pippen* was decided under Illinois law and that state is one of a small few that has adopted the Uniform Single Publication Act, the Seventh Circuit's analysis was premised on the decisions of many other jurisdictions that have not adopted the Act but which have instead applied the single publication rule through common law.  *Id.*

plaintiffs arguing that book publishers should not get the benefit of the rule because they could cease selling batches of an edition at any time. *Id.* Internet publishers—like the *IndyStar* and the AP here—are similar to those book publishers, and "no court has been persuaded that the even greater control that Internet publishers have over their content—and the much lower cost of editing or deleting that content" is reason not to apply the single publication rule. *Id.* at 615-16. Quite the opposite, courts recognize that "the Internet's greater reach comes with an even greater potential for endless retriggering of the statute of limitations, multiplicity of suits and harassment of defendants." *Id.* at 616.

Accordingly, under the single publication rule, Defendants "posting stories to their web sites" is a single act, and maintaining—and refusing to remove—those postings does not count as a "republication" for which new defamation liability can be asserted. *Id.* at 616; *accord Kiebala v. Boris*, 928 F.3d 680, 687 (7th Cir. 2019) (same). Put another way, "[d]espite the continued public availability—some would call it repeated publication—of such material, there is a single publication at the time the posting is made." Sack on Defamation § 7.2.2 (5th Ed. April 2021).[14]

The Seventh Circuit's recent opinion in *Pack v. Middlebury Cmty. Sch.*, 990 F.3d 1013, 1017 (7th Cir. 2021), decided under Indiana law, is instructive.[15] In *Pack*, a former teacher sued his school district under a non-disparagement provision in a settlement agreement, alleging that the district's maintenance of a pre-existing disparaging press release on its website violated the agreement by constituting continuing, ongoing disparagement. In deciding the issue, the Seventh Circuit noted that Indiana's position on the single-publication rule would inform the outcome, but that Indiana had no decisions accepting or rejecting the rule. *Id.* at 1018 n.2. In predicting

---

[14] Pursuant to L.R. 7-1(f), a copy is attached as Exhibit L.
[15] *Pack* was published two months prior to NPA's complaint, yet is omitted from its lengthy "allegations" concerning Indiana law.

how the Indiana Supreme Court would decide the issue, the Seventh Circuit explained (just as it did in *Pippen*) that "[t]he majority approach to a defamation case involving a single statement posted online is to apply the single-publication rule." *Id.* at 1020. Accordingly, the Seventh Circuit predicted that "the Indiana Supreme Court would conclude that the press release is not a new statement each time someone accesses it on the School's website." *Id.* at 1021.

Under *Pack*, the *IndyStar's* and the AP's articles are not republished each time a new person views the content, and there is no liability for continuing to maintain webpages that were not defamatory when they were originally published. *Accord Pippen*, 734 F.3d at 616*; see also Lokhova v. Halper*, 995 F.3d 134, 142 (4th Cir. 2021) ("In the absence of a Virginia Supreme Court ruling, we have determined that Virginia would follow the great majority of states that now follow the single publication rule.") (quotation and citation omitted); *Clark v. Viacom Int'l Inc.*, 617 F. App'x 495, 503–04 (6th Cir. 2015) ("**After *Firth* [a 'leading case' from 2002], no other court in the country has failed to extend the single publication rule to the online domain.**") (emphasis added).

### E. Restatement (Second) of Torts Section 577 is irrelevant.

To support its novel continuing defamation theory, NPA's complaint also cites to Section 577 of the Restatement (Second) of Torts. Section 577(2) states that "[o]ne who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." While NPA focuses on the phrase "continued publication," the Restatement is clear that Section 577 has no relevance to the single-publication rule (the subject of § 577A) and means only that a property-owner can be liable for *adopting* the defamatory statements *made by another third-party* on its property if the owner allows the defamatory statements to continue to

remain published on its property.  NPA's own complaint admits as much, conceding the "rule applies to statements by *third* parties."  (Compl. ¶ 106 (emphasis added).)

In predicting Indiana would adopt Section 577, the Seventh Circuit confirmed the same, stating that the "[a]doption of another's publication is an old basis of liability" and "[f]ailing to remove a libel from your building, after notice and opportunity to do so, is a form of adoption." *Tacket v. Gen. Motors Corp.*, 836 F.2d 1042, 1046 (7th Cir. 1987).  Section 577 and *Tacket*, however, have no relevance whatsoever to this case because there is no statement posted on Defendants' website by an outsider that NPA alleges Defendants have adopted by failing to remove:[16]  rather, *Defendants' own publications are on their own websites*.

True, as NPA's letters note (Exs. 7, 9), one court has expressed, albeit it guardedly, the conclusion that NPA's complaint asks this court to adopt.  *Taub v. McClatchy Newspapers, Inc.*, 504 F. Supp. 2d 74, 80 n.8 (D.S.C. 2007).  *Taub*, however, which has been criticized and rejected by South Carolina trial and appellate courts, was decided based on "informal letters," the court was presented with no on-point authority, and the court acknowledged it "*cannot state with certainty* that South Carolina, if faced with the issue of whether an article continues to be published once it moves to a website's online archive, would follow the single publication rule." *Id.* at 78 (emphasis added).  Yet the South Carolina District Court nonetheless concluded that Section 577's reference to "continued publication" "lends credence" to such a claim.  *Id.* 80 n.8.

Not a single court has followed *Taub's* reasoning.  Rather, South Carolina state trial and appellate courts have described the *Taub* decision as non-binding and rejected its result in favor of the single-publication rule.  *Trexler v. The Ass'n Press*, No. 2010CP401249, 2013 WL

---

[16] 47 U.S.C. § 230 would, of course, bar any such claim in the context of Defendants not removing content published by an outsider on Defendants' websites.

9963459, at *3 (S.C.Com.Pl. Apr. 30, 2013) ("[W]hen presented with the question of the application of the single publication rule with respect to publications posted on the Internet, South Carolina will follow the single publication rule."), *aff'd*, No. 2015-UP-201, 2015 WL 1681002, at *1 (S.C. Ct. App. Apr. 15, 2015).

The Ninth Circuit has also rejected NPA's argument after analyzing Section 577, *Tacket*, and similar authorities, and held they were all wholly "inapposite" because "[n]one of these authorities addresses the definition of republication; indeed, none addresses the single-publication rule at all." *Roberts v. McAfee, Inc.*, 660 F.3d 1156, 1168 (9th Cir. 2011). NPA's position—that Section 577 creates continuing liability for one's own online publication on one's own website—is also untenable because it would eviscerate the single publication rule, the law of nearly all jurisdictions which the Seventh Circuit predicted Indiana would apply. *Pack*, 990 F.3d at 1021 (7th Cir. 2021).

At bottom, there are no allegations of actual malice at the time of original publication, so NPA's defamation claim must be dismissed for failure to state a claim.

## V.   NPA's claim against the AP fails under the wire-service defense.

In addition to the above reasons, all of which apply equally to the AP's article, NPA's claim against the AP fails because the AP obtained its facts from the *IndyStar*, which the complaint concedes is "a well-known and widely read news source." (Compl. ¶ 10.) Wire services like the AP fulfill a vital role in the dissemination of news and information, and requiring them to individually vet the underlying facts of every newspaper article they report in their wire service would destroy their utility. *Winn v. Associated Press*, 903 F. Supp. 575, 579 (S.D.N.Y. 1995) ("As a general matter, most modern publishers could not afford to verify the absolute authenticity of every news item, and continue to promptly disseminate news of national or worldwide interest."), *aff'd,* 104 F.3d 350 (2d Cir. 1996).

Sometimes called the (reverse) wire-service defense, wire services like the AP are not liable as a matter of law for their republications. *Id.* ("[T]he wire service defense is available where, as here, a news organization reproduces an apparently accurate article by a reputable publisher, without substantial change and without actual knowledge of its falsity."); *Reilly v. Associated Press*, 797 N.E.2d 1204, 1217 (Mass. App. 2003) (adopting the defense: "To operate efficiently, newspapers must be able to trust wire services, and wire services must be able to trust newspapers for original, nonwire service generated material."); *see also Holden v. Clary*, No. 92-cv-313, 1992 WL 373145, at *4 (E.D. Va. Sept. 17, 1992) (wire service's reliance on newspaper precluded liability); *Winn v. United Press Int'l*, 938 F. Supp. 39, 44 (D.D.C. 1996) (collecting authority and applying wire service defense), *aff'd,* 1997 WL 404959 (D.C. Cir. July 14, 1997); *Kapetanovic v. Stephen J. Prods., Inc.*, No. 97-cv-2224, 2002 WL 475193, at *7 (N.D. Ill. Mar. 27, 2002) (applying wire defense where publisher acted as "conduit" for information); *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1477 (S.D. Fla. 1987) ("The same privilege ought to apply to news periodicals such as *Newsweek*, which very obviously must rely for their sources of information upon other reliable periodicals, newspapers and wire service reports.").

The defense applies here and precludes liability because the AP published the gist of first Gannet article, including NPA's rebuttal statements, and the complaint concedes that the *IndyStar* is a well-known and widely read newspaper publication.  Moreover, as noted above, no allegation suggests that the AP believed or suspected that the *IndyStar* article was false.

## VI.   The allegedly defamatory statements are non-actionable opinion and hyperbole, based on fully disclosed facts.

### A.   The statements are not capable of defamatory meaning.

Not only is NPA's claim subject to dismissal because it is time-barred, barred by collateral estoppel, and challenges privileged reports made without actual malice, the case should

also be dismissed because the alleged defamatory statements are not actionable as a matter of law. *Collins v. Purdue Univ.*, 703 F. Supp. 2d 862, 874 (N.D. Ind. 2010) ("The determination of whether a communication is defamatory is generally a question of law for the court."). "[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable." *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993).

Here, the police statements and alerts quoted in Defendants' articles are not actionable because they were expressing the police chiefs' and officer's opinion on and interpretation of NPA's fundraising letters. Namely, the articles show the police were of the view that the letters' references to the local community would cause people to donate money wrongly believing they were helping their local police department. The police surmised this was a "scam" an "angle" and "fraudulent" and more likely to harm (*i.e.*, "prey[] upon") "a large population of elderly residents" who likely would fail to appreciate the letters' nuances that NPA claims makes the fundraising not deceptive. Such "a statement of opinion relating to a matter of public concern that does not contain a provably false proposition is not actionable." *Pope v. Chron. Pub. Co.*, 95 F.3d 607, 614 (7th Cir. 1996).

While NPA's complaint (at ¶ 17) points to a scattering of instances where the term "scam" has been used as surplusage in criminal indictments, there was no indictment or even an arrest here. Rather, "the word 'scam' does not have a precise meaning … it means different things to different people … and there is not a single usage in common phraseology." *McCabe v. Rattiner*, 814 F.2d 839, 843 (1st Cir. 1987) ("The lack of precision makes the assertion 'X is a scam' incapable of being proven true or false."). Indeed, the police warnings here further make

clear that the term was used as hyperbole to warn residents of the police's opinion that residents

should be wary and "do your homework" before donating.

Just like in *McCabe*, courts routinely hold that referring to practices as "scams" or

"frauds" will not sustain a defamation claim.  In *Daniel v. City of Glendale*, No. 14-cv-3864,

2015 WL 5448562, at *3 (C.D. Cal. Mar. 19, 2015), *adopted*, 2015 WL 5448648 (C.D. Cal. Apr.

9, 2015), for example, defendant was similarly sued for referring to plaintiff's fundraising efforts

as a "scam" and calling on the police to take action.  The court had no difficulty in dismissing the

complaint because "scam" merely "expresses [defendant's] subjective opinion" of the

fundraiser's activities and "cannot reasonably be interpreted as stating actual facts about

plaintiff."  *Id.* at *9; *accord Uhler v. Galesi Mgmt. Corp.*, No. 3:98-cv-0005, 1999 WL 20949, at

*8 (N.D. Tex. Jan. 8, 1999) (stating that employee was trying to "scam" his employer was

"nothing more than expressions of opinion which are not objectively verifiable").

Similarly, it is clear that the news media can report on claims that a defendant is engaging

in a scam or fraud.  In *Kirk v. CBS, Inc.*, No. 83-cv-2764, 1987 WL 11831, at *5 (N.D. Ill. June

4, 1987), for example, the court determined that CBS's reporting on statements that cancer

doctors were peddling a fake and false treatment were "protected statements of opinion not

redressable under defamation law."  *See also Paterson v. Little, Brown & Co.*, 502 F. Supp. 2d

1124, 1135 (W.D. Wash. 2007) ("ripped-off" "took a ride on" "fraud" "scandal" "snake-oil job"

"scam" "unethical" "cancer con-artists" are "imprecise hyperbole, incapable of defamatory

meaning"); *Seidl v. Greentree Mortg. Co.*, 30 F. Supp. 2d 1292, 1316-17 (D. Colo. 1998)

(asserting plaintiff was acting with "fraudulent purposes" was "rhetorical hyperbole."); *Two

Jinn, Inc. v. Green*, No. 1:06-cv-268, 2007 WL 1381804, at *5 (D. Idaho Mar. 7, 2007) (granting

motion to dismiss: "As to the word 'scam,' the Court finds that such figurative language does not imply false assertions of an objective fact.").

**B.     The statements are opinions because they are based on fully disclosed facts.**

Even if NPA is correct that calling something a "scam" or similar can be defamatory, that is not true here because the fundraising letters the police characterized as "scams" were fully published.  Because they are based on non-defamatory facts that have been laid out in full they are non-actionable pure opinions.  *Stevens v. Tillman*, 855 F.2d 394, 400-01 (7th Cir. 1988).

As stated in *Stevens* by the Seventh Circuit, "[w]hen a statement in the form of an opinion discloses the defamatory facts, (or refers to facts in the public record), it is not actionable apart from those facts."  *Id.*  at 400.  In explaining the rule, *Stevens* relied upon a case in which a newspaper's allegations of a "sleazy" "rip off" were protected because it "earlier had published the facts on which the characterizations had been based."  *Id.* (*citing Horowitz v. Baker*, 523 N.E.2d 179 (Ill. 3d Dist. 1988)).  Here, NPA's letters were published in the article and publicly available, so the police's opinions on the propriety of the letters cannot support a claim.

This widely adopted  principle is stated in Restatement (Second) of Torts § 566 cmt. c: "A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is."  *E.g., Piccone v. Bartels*, 785 F.3d 766, 771 (1st Cir. 2015) (claim against police failed because "a speaker can immunize his statement from defamation liability by fully disclosing the non-defamatory facts on which his opinion is based."); *Dunn v. Gannett N.Y. Newspapers, Inc.*, 833 F.2d 446, 453-54 (3d Cir. 1987) (applying Restatement); *Biospherics, Inc. v. Forbes, Inc.,* 151 F.3d 180, 185 (4th Cir. 1998) ("When the bases for the conclusion . . . are fully disclosed, no reasonable reader would consider the term anything but the opinion of the author drawn from the circumstances related."); *Berry v. Schmitt*, 688 F.3d 290,

303-04 (6th Cir. 2012) (same); *Open Source Sec., Inc. v. Perens*, 803 F. App'x 73, 75-76 (9th Cir. 2020) (same); *Bundren v. Parriott*, 245 F. App'x 822, 828 (10th Cir. 2007) (same).

The rationale is that presented with the source material, "the reader can make an independent judgment as to the reasonableness of the comment; if the comment is unreasonable, the defendant would be defaming himself rather than the subject of his remarks."  Alfred Hill, *Defamation and Privacy Under the First Amendment*, 76 Colum. L. Rev. 1205, 1229 (1976). NPA's disagreement with the police characterizing its fundraising letters as a scam may or may not be valid.  But Defendants' publicly posting or linking to the full letters at issue is another reason to dismiss NPA's defamation claim against Defendants.

## CONCLUSION

For these reasons, Defendants request that the Court dismiss NPA's complaint, with prejudice, for failure to state a claim upon which relief can be granted.

Dated:  July 1, 2021

*/s/ Tracy Betz*
Tracy Betz, Atty. No. 24800-53
TAFT STETTINIUS & HOLLISTER LLP
One Indiana Square, Suite 3500
Indianapolis, Indiana 46204-2023
Telephone: (317) 713-3500
*tbetz@taftlaw.com*

Lynn Rowe Larsen (*pro hac vice*)
Daniel H. Bryan (*pro hac vice*)
TAFT STETTINIUS & HOLLISTER LLP
200 Public Square, Suite 3500
Cleveland, OH  44114-2302
Telephone:  216-241-2838
*llarsen@taftlaw.com*
*dbryan@taftlaw.com*

*Attorneys for Defendants Gannet Co., Inc. and The Associated Press, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 1, 2021, I electronically filed the foregoing document with the Clerk of the Court using the electronic court filing system, which will provide notification of such filing to counsel of record.

/s/ *Tracy Betz*
Tracy Betz

70522509

36