# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |
|---|---|
| **National Police Association, Inc.**, <br><br> *Plaintiff*, <br><br> *v.* <br><br> **Gannett Co., Inc.**; and **The Associated Press, Inc.**, <br><br> *Defendants* | **No. 1:21-cv-1116-TWP-DLP** |

# Plaintiff National Police Association, Inc.'s Response in Opposition to Defendants' Motion to Dismiss

James Bopp, Jr., IN # 2838-84
Courtney Turner Milbank, IN# 32178-29
Joseph D. Maughon, VA# 87799*
The Bopp Law Firm, PC
1 South Sixth Street
Terre Haute, IN 47807-3510
(812) 232-2434 - Telephone
(812) 235-3685 - Facsimile
jboppjr@aol.com
cmilbank@bopplaw.com
jmaughon@bopplaw.com
*Counsel for Plaintiff*
*\*Admitted pro hac vice*

# Table of Contents

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -iv-

Introduction. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -1-

The Fact of the Retractions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -5-

Standard of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

I. NPA's Claims Are Well Within the Statute of Limitations . . . . . . . . . . . . . . . . . . . . . -8-

II. NPA's Claims Are Not Barred by Collateral Estoppel or Issue Preclusion. . . . . . . . . . . . . -9-

III. "Fair Report" Privilege Does Not Apply to Statements Known to be False. . . . . . . . . . . . -12-

IV. NPA's Defamation Claim Meets the Elements of Continued-Publication Defamation,
     Including Actual Malice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

     A.     NPA Has Sufficiently Pled Actual Malice Under Sec. 577(2) . . . . . . . . . . . . . -15-

     B.     Defendants' Failure to Retract Shows the Malice a Sec. 577(2) Pleading
           Requires . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

     C.     As Discussed in the Complaint, Indiana Does Recognize the Continued-
           Publication Rule, Which Is Not in Conflict With the Single-Publication
           Rule. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

     D.     Sec. 577(2) Is Relevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -20-

V. The Wire-Service Defense is Inapplicable Here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -23-

VI. The Defamatory Statements are Not Mere Opinion or Hyperbole . . . . . . . . . . . . . . . . . -25-

     A.     The Statements are Factual, Which All Context Demonstrates . . . . . . . . . . . . -25-

     B.     The Disclosure of Facts Alone Does Not Make a Statement Opinion, and Here
           Not All Relevant Facts Were Disclosed . . . . . . . . . . . . . . . . . . . . . . . . . . . . -28-

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -30-

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -32-

# Table of Authorities

*Cases*

*Aafco Heating & Air Conditioning Co. v. Nw. Publ'ns, Inc.*, 321 N.E.2d 580 (Ind. Ct. App. 1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -14-

*Adams v. City of Indianapolis*, 742 F.3d 720 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . -9-

*Appleby v. Daily Hampshire Gazette*, 478 N.E.2d 721 (1985). . . . . . . . . . . . . . . . . . . . . . . . -24-

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

*Beisel v. Zerbe Twp.*, 11 Pa. D. & C.3d 541 (Pa. Com. Pl. 1979) . . . . . . . . . . . . . . . . . . . . . -21-

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-

*Biro v. Conde Nast*, 963 F.Supp.2d 255 (S.D.N.Y. 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

*Brown & Williamson Tobacco Corp. v. Jacobson*,  713 F.2d 262 (7th Cir. 1983). . . . . . . . . . -14-

*Brown v. Courier Herald Publishing Co., Inc.*, 700 F.Supp. 534 (S.D.Ga.1988) . . . . . . . . . . -24-

*Carney v. Patino*, 114 N.E.3d 20 (Ind. Ct. App. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . -8-, -30-

*Carroll etc. Hosp. Auth. v. Cox Enterprises*, 256 S.E.2d 443 (1979). . . . . . . . . . . . . . . . . . . . -4-

*Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713 (7th Cir. 1994). . . . . -8-, -9-

*Danielson v. USAA Fed. Sav. Bank*, No. 6:17-CV-02849-AMQ, 2018 WL 2461981 (D.S.C. June 1, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -21-

*Davidson v. Perron*, 716 N.E.2d 29 (Ind. Ct. App. 1999) . . . . . . . . . . . . . . . . . . . . . . . . -8-, -30-

*DeGuelle v. Camilli*, 664 F.3d 192 (7th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -7-, -9-

*Dilworth v. Dudley*, 75 F.3d 307 (7th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

*Fairfax v. CBS Corp.*, 2 F.4th 286 (4th Cir. 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -16-

*Files v. Deerfield Media (Mobile), Inc.*, No. CV 19-0742-WS-B, 2020 WL 1161089 (S.D. Ala. Mar. 10, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -15-

*Gertz v. Robert Welch, Inc.*, 680 F.2d 527 (7th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

*Grip–Pak, Inc. v. Illinois Tool Works*, Inc., 694 F.2d 466 (7th Cir.1982) . . . . . . . . . . . . . . . -11-

*Harte-Hanks Communications v. Connaughton*, 491 U.S. 657 (1989) . . . . . . . . . . . . . . . . . -13-

*Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58 F.3d 303 (7th Cir. 1995) . . . . . . -9-

*Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . -24-

*Huon v. Denton*, 841 F.3d 733 (7th Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

*In Klingman v. Levinson*, 831 F.2d 1292 (7th Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, No.
    114ML02570RLYTAB, 2020 WL 1532132 (S.D. Ind. Mar. 31, 2020) . . . . . . . . . . . . . -8-

*In re Holland*, 155 B.R. 745 (Bankr.S.D.Ind.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*Johnson v. Bd. of Sch. Comm'rs of City of Indianapolis*, No. 1:09-CV-574-WTL-TAB,
    2010 WL 4097149 (S.D. Ind. Oct. 6, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*Johnston v. So*, 859 F. Supp. 1197 (N.D. Ind. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -10-

*Jones v. Indiana Fin. Co.*, 180 B.R. 531 (S.D. Ind. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*Journal–Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446 (Ind.1999) . . . . . . . . . . . . . . . -13-

*Khawar v. Globe Intern., Inc.*, 19 Cal.4th 254 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-

*LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co.*, No. 1:08-CV-243, 2010 WL
    2608342 (N.D. Ind. June 25, 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

*Matrix IV, Inc. v. Am. Nat. Bank & Tr. Co. of Chicago*, 649 F.3d 539 (7th Cir. 2011) . . . . . . . -9-

*Matter of Cassidy*, 892 F.2d 637 (7th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -11-

*McCabe v. Rattiner*, 814 F.2d 839 (1st Cir.1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*Milkovich v. Lorain J. Co.*, 497 U.S. 1 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -26-

*Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865 (7th Cir. 2018) . . . . . . . . . . . . . . . . . . . . . . . -23-

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -17-

**Pl.'s Resp. to Def.'s**
**Mot. Dismiss**                  -v-

*Pack v. Middlebury Cmty. Sch.*, 990 F.3d 1013 (7th Cir. 2021) . . . . . . . . . . . . . . . . . . . . . -19-, -20-

*Patten v. Smith*, 360 N.E.2d 233 (Ind. Ct. App. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -12-

*Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610 (7th Cir. 2013) . . . . . . . . . . . -13-, -17--19-

*Rambo v. Cohen*, 587 N.E.2d 140 (Ind. Ct. App. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-

*Roberts v. McAfee*, 660 F.3d 1156 (9th Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -22-

*S. Bell Tel. & Tel. Co. v. Coastal Transmission Serv., Inc.*, 307 S.E.2d 83 (1983) . . . . . . . . . . -4-

*Starr Indem. & Liab. Co. v. Tech. Ins. Co.*, 379 F. Supp. 3d 723 (N.D. Ill. 2019) . . . . . . . . . . -9-

*Stevens v. Tillman*, 855 F.2d 394 (7th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

*Sullivan v. Am. Cas. Co. of Reading, Pa.*, 605 N.E.2d 134 (Ind. 1992) . . . . . . . . . . . . . . . . . -11-

*Tacket v. Delco Remy Div. of Gen. Motors Corp.*, 678 F. Supp. 1387 (S.D. Ind.) . . . . . . . . . -22-

*Tacket v. General Motors Corp.*, 836 F.2d 1042 (7th Cir. 1987) . . . . . . . . . . . . . . . . . . . . *passim*

*Taub v. McClatchy Newspapers, Inc.*, 504 F. Supp. 2d 74 (D.S.C. 2007) . . . . . . . . . . . . -15-, -21-

*Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, No. 02 C 3293, 2004 WL 7339192
     (N.D. Ill. Sept. 1, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -27-, -28-

*Winn v. Associated Press*, 903 F. Supp. 575 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . . . . . . -23-, -24-

*Wojcik v. Almase*, 451 N.E.2d 336 (Ind. Ct. App. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . -8-

**Statutes**
*Ala. Code § 13A-11-161* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *-15-*

*Ind. Code Ann. § 34-11-2-4* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *-8-*

**Other Authorities**
Restatement (Second) of Torts § 566 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -29-

Restatement (Second) of Torts § 577(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Restatement (Second) of Torts § 577A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -2-, -3-, -18-

Restatement (Second) of Torts § 611 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . -13-, -14-

Plaintiff National Police Association, Inc. ("**NPA**"), by and through its counsel of record, hereby responds in opposition to *Defendants Gannett Co., Inc. and the Associated Press, Inc.'s Motion to Dismiss Plaintiff's Complaint* and its accompanying brief (together, "**Motion to Dismiss**" or "**Mot. Dismiss**"), stating as follows:

## Introduction

Standing Seventh Circuit precedent predicts that, if asked, Indiana would adopt the **continued-publication rule** for a claim of defamation and, therefore, applies it as the law of Indiana: "'One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication.'" *Tacket v. General Motors Corp.*, 836 F.2d 1042, 1046–47 (7th Cir. 1987) (quoting Restatement (Second) of Torts § 577(2) (Am. Law Inst. 1977)) (stating, "We predict that Indiana will follow § 577(2) when the time comes, as have other states.") ("**Sec. 577(2)**" or **"continued-publication rule"**).[1] The claim brought in NPA's *Verified Complaint for Damages and Injunctive Relief* ("**Complaint**" or "**Compl.**") falls squarely under the continued-publication law. Plaintiff premises the Defendants' liability for the defamatory articles on their continued-publication on their web sites, without the demanded retraction or removal, *after the Defendants were notified of the false and defamatory nature of their articles and their refusal to retract or take the defamatory articles down from their websites.* Compl., ECF 1, ¶¶ 74-89.

This fits squarely under Sec. 577(2). First, as the Comments explain, "the duty arises only when the defendant knows that the defamatory matter is being exhibited on his land or chattels." Restatement (Second) of Torts § 577(2), Comment (p) (Am. Law Inst. 1977) ("**Sec. 577(2),**

---

[1] Since *Tacket*, no Indiana state court has had the occasion to consider if the continued-publication rule is the rule under Indiana law, so *Tacket* requires this Court to apply the continued-publication rule to this case, which is based on Indiana law.

**Comment (p)**"). Regardless of whether Defendants knew that the articles contained defamatory material when originally published—when the articles said that "(t)his Indianapolis charity says it helps police. Police Chiefs say it's a scam," Compl., ECF 1, ¶ 10—the quoted police chiefs all retracted the "scam" claim, *id.* ¶¶ 63–73, of which Plaintiff recently notified Defendants. *Id.* ¶¶ 74–89. At this point, Defendants are "required only to exercise reasonable care to abate the defamation," Sec. 577(2), Comment (p), which here would have been to publish a retraction to the articles and take them down, but Defendants, now knowing that the articles were defamatory, did nothing, leaving the defamatory articles on their websites. As a result, Defendants are liable for defamation, as Sec. 577(2), Comment (p) explains: "(b)ut when, by measures not unduly difficult or onerous, he may easily remove the defamation, he may be found liable if he intentionally fails to remove it." *Id.*

Defendants, however, spend many pages discussing a completely different rule, the **single-publication rule**, Mot. Dismiss, ECF 19, PageID#178–183, a rule that is neither incompatible with the continued-publication rule nor otherwise relevant to the rule upheld in *Tacket*. As a result, they spend very little addressing NPA's actual claims under the continued-publication rule.

The single-publication rule noted by Defendants is subsection (3) of the Restatement (Second) of Torts § 577A (Am. Law Inst. 1977) ("**Sec. 577A**"), which provides as follows:

(1)  Except as stated in Subsections (2) and (3), each of several communications to a third person by the same defamer is a separate publication.

(2)  A single communication heard at the same time by two or more third persons is a single publication.

(3)  Any one edition of a book or newspaper, or any one radio or television broadcast, exhibition of a motion picture or similar aggregate communication is a single publication.

(4)  As to any single publication,

    (a)  only one action for damages can be maintained;

    (b)  all damages suffered in all jurisdictions can be recovered in the one action; and

> (c)      a judgment for or against the plaintiff upon the merits of any action for damages bars any other action for damages between the same parties in all jurisdictions.

So the single-publication rule, Sec. 577A(3), is a limited exemption to the general rule that "each of several communications to a third person by the same defamer is a separate publication." Sec. 577A(1). This limited exemption applies to "(t)he printing and distribution of extra copies of the first edition of a book (which) may properly be treated as mere continued circulation of the first edition and hence as still party of the single publication," since the purpose of the limited exemption is "the necessity of protecting defendants and the courts from the numerous suits that might be brought for the same words if each person reached by such a large-scale communication could serve as the foundation for a new action." Sec. 577A, Comment (c), (d). However, this exemption is limited since

> the single publication rule stated in Subsection (3) does not include separate aggregate publications on different occasions. Thus if the same defamatory statement is published in the morning and evening editions of a newspaper, each edition is a separate single publication and there are two causes of action. The same is true of a rebroadcast of the defamation over radio or television or a second run of a motion picture on the same evening. In these cases the publication reaches a new group and the repetition justifies a new cause of action. The justification for this conclusion usually offered is that in these cases the second publication is intended to and does reach a new group.

Sec. 577A, Comment (d).

Defendants, however, argue that "under the single-publication rule, Defendants' website articles are single publications, made on the day of their posting, not continuous republications that permit a new claim each time a new person views the webpage, so NPA's 'continued publication defamtion' claim fails." Mot. Dismiss, ECF 19, PageID#179. However, Plaintiff has not based its claim of defamation on "*continuous re*publication" (emphasis added) of the articles by their placement on Defendants' websites. Instead, Plaintiff bases its claim on Sec. 577(2), since the premise of the continued-publication rule in Sec. 577(2) is to cast liability on the publisher, *only*

*after the publisher becomes aware of the false and defamatory nature of the publication and fails to take reasonable steps to remove the defamation.* Here that is a retraction on their websites and the taking down of the defamatory articles from their websites. This newly obtained knowledge of the defamatory nature of the articles, and subsequent unreasonable inaction by the Defendants by failing to retract and to remove the articles from their websites, is the premise of Plaintiff's claim.

Defendants themselves, after spending much ink discussing the single-publication rule, unexpectedly concede that the single-publication rule is not even relevant to NPA's claims, stating, "the Restatement is clear that Section 577 has no relevance to the single-publication rule (the subject of § 577A)." Mot. Dismiss, ECF 19, PageID#181. And if Defendants' concession weren't enough, the courts that have recognized the continued-publication rule, enunciated in *Tacket,* make this exceedingly clear. In a Georgia case, "The injury sued for . . . [was] the continuation of distribution [of defamatory material] after the error had been brought to the attention of local and regional Southern Bell officials." *S. Bell Tel. & Tel. Co. v. Coastal Transmission Serv., Inc.*, 307 S.E.2d 83, 88 (1983). The court found that the evidence "authorize[d] the finding that appellant knowingly exercised its control over the publication of the libel by allowing additional distribution of the yellow pages directories," *and* that "[t]his conclusion *does not conflict with the single publication rule* relied on by appellant. The rule is 'a device by which a widely circulated libel is litigated in one trial . . . ' to avoid 'a multiplicity of suits and an almost endless tolling of the statute of limitations . . . .'" *Id.* at 615–16 (citing *Carroll etc. Hosp. Auth. v. Cox Enterprises*, 256 S.E.2d 443 (1979)) (ellipses in original) (emphasis added).

In short, the single-publication rule provides that there can be only one cause of action once a claim accrues. It does not prevent a state from adopting rules recognizing a variety of mutually exclusive ways in which defamation claims may accrue, including by the continued-publication rule.

As will be shown, this alone means that a great many of Defendants' arguments, relying on the single-publication rule, fail to address the issue at hand. Furthermore, the additional arguments adduced by Defendants, such as the claim that the statements at issue are mere opinion not susceptible of defamatory meaning or that the disclosure of certain facts renders them immune from liability, misapprehend well-established law in these areas, and also fail. The motion should therefore be denied.

## The Fact of the Retractions

NPA is an organization that seeks to educate supporters of law enforcement in how to help police departments accomplish their goals.[2] Pursuant to this mission, it uses mailed fundraising materials, seeking donations from the residents of various municipalities. Defendants Gannett Co., Inc. ("**Gannett**") and The Associated Press, Inc. ("**AP**") (collectively, "Defendants"), in 2019, published three articles containing false and defamatory statements about NPA relating to these attempts to support law enforcement (collectively, "**Articles**"). However, despite ample notice of the false and defamatory nature of the Articles, and ample opportunity to retract them, neither Defendant has done so, causing grave harm to NPA and leading to this suit.

While the parties are agreed as to most of the details leading to this suit, Defendants allege that some of the retractions issued by police departments were not retractions at all. This NPA disputes. Defendants claim that because Germantown's retraction letter never specifically "said that NPA's fundraising efforts were not scams," nor that "NPA's letter was not misleading," Mot. Dismiss, ECF 19, PageID#164, it was not a retraction. Defendants focus on the fact that the letter

---

[2]As Defendants know (despite their efforts to portray NPA as somehow being *anti*-police, *see, e.g.*, Mot. Dismiss, ECF 19, PageID##156, 172), the courts of our nation exist to ensure that organizations like NPA can pursue their missions unhindered so long as they do so legally. That undesired litigation in those courts may from time to time be necessary does not mean NPA wishes to litigate against law enforcement.

"emphasiz[ed] that Germantown was not a sanctuary city," *id.*, but what Defendants omit is that the letter acknowledges that (a) NPA's fundraising letter to Germantown residents told the recipients that they were in a "sanctuary *area*," Compl. Ex. 4, ECF 1-6, PageID#60, not a sanctuary *city*, and (b) Germantown–"part of the Milwaukee metropolitan area," as the letter acknowledged, *id.*–had since been informed by NPA of Milwaukee's having "pass[ed] a sanctuary resolution prior to the NPA letter in question, the Milwaukee Public School policy of opposing cooperation with Immigration and Customs Enforcement (ICE), and a Department of Homeland Security policy statement on failure to enforce ICE Detainers," *id.* As the sanctuary status of Germantown was the whole basis of Germantown Police Chief Peter Hoell's allegation that NPA was a "scam" (Compl. Ex. 1, ECF 1-3, PageID#35; Compl., ECF 1, ¶¶ 14–15, 34–35, 45), this did indeed serve as a retraction: it did not need to use the magic words, "We retract our allegations," to do so in fact. And, of course, in addition to correcting the statements of Hoell himself, such a letter not only did indicate that "that NPA's fundraising efforts were not scams, and . . . that NPA's letter was not misleading," Mot. Dismiss, ECF 19, PageID#164, but also demonstrated the falsity of the statement in the March 17, 2019 *Indianapolis Star* article ("'Scam' Article") that "[f]undraising letters in Germantown, Wisconsin, last year falsely warned that Germantown is a sanctuary city . . . ." Compl. Ex. 1, ECF 1-3, PageID#35.

Likewise, Defendants state that Trenton and Belle Isle's statements "were not retractions either." Mot. Dismiss, ECF 19, PageID#164. This not only skirts around the fact that Trenton and Belle Isle both removed from their websites prior indications that NPA *was* a scam (thereby retracting those statements), but also ignores the facts that Trenton's statement included a copy of NPA's letter (showing that it did not, in fact, use the name of the Trenton Police Department) and affirmatively acknowledged that "National Police Association is an official organization," Compl.

Ex. 5, ECF 1-7, PageID#62, while Belle Isle's update (like Germantown's) affirmatively acknowledged both that Belle Isle was part of a sanctuary area and that NPA is an official organization, Compl. Ex. 6, ECF 1-8, PageID#64.

Therefore, like Germantown's retraction, these two statements did, in fact, retract the very allegations at issue in the first place. They did not need to invoke a particular incantation to do so. Furthermore, Belle Isle's retraction (stating that NPA's fundraising referred only to a "sanctuary area") also demonstrated the falsity of the 'Scam' Article's allegation, "[P]eople in [Belle Isle, Florida] started receiving mail that claimed they lived in a sanctuary city," Compl. Ex. 1, ECF 1-3, PageID#37.

Therefore, Defendants' claim that these municipalities did not retract their false statements is incorrect.[3]

## Standard of Review

A complaint must include "enough facts to state a claim to relief that is plausible on its face" to withstand a motion to dismiss. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim has facial plausibility and a motion to dismiss must be denied "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In order to survive a motion to dismiss, a plaintiff must allege more than labels and conclusions and must do more than make a "formulaic recitation of the elements of a cause of action." *DeGuelle v. Camilli*, 664 F.3d 192, 198 (7th Cir.

---

[3]While Defendant lists a scattering of other police departments that (according to Defendant) "published . . . scam alerts" about NPA, Mot. Dismiss, ECF 19, PageID##158–59, it is difficult to see how these are relevant to a claim that articles discussing three *particular* police departments, and their *particular* claims about NPA's letters to their localities' residents. Moreover, if this *were* a case about these other police departments, it would remain the case that the retractions that *are* at issue here would have put Defendants on notice that NPA does not "scam" in its fundraising.

2011) (citation omitted). The relevant question is whether the complaint includes enough factual allegations to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

## Argument

### I. NPA's Claims Are Well Within the Statute of Limitations

Defendants claim that because two of the Articles were published "two years and two months before this suit was brought," Mot. Dismiss, ECF 19, PageID#165, the suit is time-barred. However, the two-year statute of limitations on defamation claims only begins "after the cause of action accrues," Ind. Code Ann. § 34-11-2-4. "Generally, a claim accrues when all its elements have come into existence." *Cathedral of Joy Baptist Church v. Vill. of Hazel Crest*, 22 F.3d 713, 717 (7th Cir. 1994). "In other words, '[a] cause of action accrues when all the elements necessary for recovery are met.'" *In re Cook Med., Inc., IVC Filters Mktg., Sales Pracs. & Prod. Liab. Litig.*, No. 114ML02570RLYTAB, 2020 WL 1532132, at *3 (S.D. Ind. Mar. 31, 2020) (citing *Wojcik v. Almase*, 451 N.E.2d 336, 341 (Ind. Ct. App. 1983)). NPA's claims were brought three months after all elements had been met, well within the two-year statute of limitations.

The elements of defamation are "(1) a communication with defamatory imputation, (2) *malice*, (3) publication, and (4) damages." *Carney v. Patino*, 114 N.E.3d 20, 28 n.3 (Ind. Ct. App. 2018) (emphasis added) (internal quotation marks omitted) (citing *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999) *trans. denied* (2000)). "One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its *continued publication*." Restatement (Second) of Torts § 577(2) (Am. Law Inst. 1977) ("**Sec. 577(2)**" or **"continued-publication rule"**) (emphasis added). Therefore, a cause of action for *continued defamation* accrues only when the person in control of the forum in which the defamation was published knows of the defamatory nature of the matter but

nonetheless fails to remove it–thereby satisfying the malice element at that time, *infra* Part IV(A)-
(B)–thus engaging in continued publication.

In this case, Defendants were given notice of the false and defamatory nature of their
publications on February 19, 2021 (retraction letters to the *Indianapolis Star* ("*Star*") and AP)
and March 22, 2021 (second retraction letter to the *Star*). It was only at this time, then, that "all .
. . elements ha[d] come into existence," *Cathedral of Joy Baptist Church*, 22 F.3d at 717.

This lawsuit was filed on May 3, 2021, less than three months after the first retraction
letters were sent. This is, of course, well within the two-year statute of limitations.

**II. NPA's Claims Are Not Barred by Collateral Estoppel or Issue Preclusion.**

Defendants argue that collateral estoppel and issue preclusion bar NPA's suit against them,
Mot. Dismiss, ECF 19, PageID#167, but the doctrine of collateral estoppel has no relevance here.

"Collateral estoppel, or issue preclusion, precludes the relitigation of an issue that has been
resolved in a previous lawsuit between the same parties or their privies." *Starr Indem. & Liab. Co.
v. Tech. Ins. Co.*, 379 F. Supp. 3d 723, 727 (N.D. Ill. 2019) (citing *DeGuelle v. Camilli*, 724 F.3d
933, 935 (7th Cir. 2013)). It has four elements:

> (1) the issue sought to be precluded is the same as an issue in the prior litigation; (2)
> the issue must have been actually litigated in the prior litigation; (3) the
> determination of the issue must have been essential to the final judgment; and (4) the
> party against whom estoppel is invoked must have been fully represented in the prior
> action.

*Adams v. City of Indianapolis*, 742 F.3d 720, 736 (7th Cir. 2014) (citing *Matrix IV, Inc. v. Am. Nat.
Bank & Tr. Co. of Chicago*, 649 F.3d 539, 547 (7th Cir. 2011). Defendant "has the burden of
establishing each of these elements." *Havoco of Am., Ltd. v. Freeman, Atkins & Coleman, Ltd.*, 58
F.3d 303, 308 (7th Cir. 1995). Defendant has not shown (and cannot show) that these required
elements are met here.

First, the issue in this case is not the same as any prior litigation. *See Johnston v. So*, 859 F. Supp. 1197, 1202 (N.D. Ind. 1994) ("The first element of collateral estoppel requires identical issues."). Indeed, the issue at bar is neither identical nor similar to the issues in *NPA v. Trenton*. In *NPA v. Trenton*, the issues were whether the City of Trenton's statements constituted defamation or libel, whether such statements caused emotional distress, whether such statements caused interference with a business relationship, whether such statements amounted to civil conspiracy, and/or whether the City of Trenton was liable. Mot. Dismiss Ex. B, ECF 19-2, PageID##206-212. Notably absent from this list is whether Gannett and AP's actions constituted continued-publication defamation. The actions of the City of Trenton and the facts surrounding those issues/actions are irrelevant to determining whether, *after being made aware* that the City of Trenton and others retracted their statements, Gannett and AP can be held liable for failing to remove defamatory statements from their websites.[4] Moreover, NPA has no reason to re-visit the issues from *NPA v. Trenton* because the City already retracted the statements (Compl., ECF 1, ¶¶ 68–70; Compl. Ex. 5, ECF 1-7, PageID#62) and the statements' status as defamatory or libelous at the time they were made is not relevant to the issue at bar. Accordingly, the issue in this case is neither identical nor similar to any other issue previously litigated.

Second, the issues in *NPA v. Trenton* were never fully litigated. As Defendants admit, the case was dismissed for failure to comply with a discovery order. Mot to Dismiss, ECF 19, PageID#167, Mot. Dismiss Ex. J, ECF 19-10, PageID#267, Mot. Dismiss Ex. K, ECF 10-11, PageID##271-272. Defendants argue that such dismissal satisfies the "actually litigated" prong. Mot

---

[4] Even Defendants admit that NPA did not litigate the issue currently at bar—stating that "there is no doubt that NPA had the full and fair opportunity to litigate its defamation claim in its suit against Trenton[.]" Mot. Dismiss, ECF 19, PageID#167. But this case is not about whether the City of Trenton made defamatory or libelous statements.

to Dismiss, ECF 19, PageID##167-168. In doing so, they cite cases from the Third Circuit, D.C. Circuit, and a bankruptcy court to justify their argument. *Id*. But Defendants ignore that "[t]he Seventh Circuit has stated on several occasions that default judgments do not satisfy the 'actually litigated' prong of collateral estoppel." *Jones v. Indiana Fin. Co.*, 180 B.R. 531, 533 (S.D. Ind. 1994) (citing *In Klingman v. Levinson*, 831 F.2d 1292 (7th Cir.1987), *Matter of Cassidy*, 892 F.2d 637, 640, n. 1 (7th Cir.1990); *Grip–Pak, Inc. v. Illinois Tool Works*, Inc., 694 F.2d 466, 469 (7th Cir.1982); *In re Holland*, 155 B.R. 745, 748 (Bankr.S.D.Ind.1992)). Likewise, this dismissal for failing to comply with a discovery order cannot satisfy the "actually litigated" prong.[5] So, under relevant precedent, the issues in *NPA v. Trenton* were never fully litigated and NPA cannot be collaterally estopped from bringing their claim.

Third, as shown above, the issues in *NPA v. Trenton* were never fully litigated nor the did court determine the issues. Absent such litigation or determination, it cannot be said that the determination of the issues was essential or necessary to the final dismissal. Nor do Defendants argue that any decision of the issues in *NPA v. Trenton* was essential or necessary to the Court's dismissal. So this prong is also not satisfied.[6]

In addition to these elements, courts have held that even if a party "had a full and fair opportunity to litigate the issue[,]" the court must also determine whether it would be unfair to permit the use of collateral estoppel in this case." *Johnson v. Bd. of Sch. Comm'rs of City of Indianapolis*, No. 1:09-CV-574-WTL-TAB, 2010 WL 4097149, at *2 (S.D. Ind. Oct. 6, 2010); *Sullivan v. Am. Cas. Co. of Reading, Pa.*, 605 N.E.2d 134, 138 (Ind. 1992). Here, it would be unfair

---

[5] Even if the dismissal constituted a final decision on the merits—which NPA does not concede—such decision does not mean that the issue was ever litigated.

[6] NPA does not argue that it was not represented in the *NPA v. Trenton* case.

to permit the use of collateral estoppel because NPA has not had the opportunity to litigate whether Gannet and AP are liable for failing to remove defamatory statements from their website, after being made aware that such statements were false and retracted.

As shown, Defendants failed to meet their burden of proof which requires proving that the elements of collateral estoppel are met. So Plaintiff cannot be collaterally estopped from bringing this suit. On the other hand, Plaintiff has shown why collateral estoppel does not apply here—as the issue in this case was never pled, claimed, litigated, or determined by a prior court, and it would be unfair to prevent NPA from litigating it now. Accordingly, the doctrine of collateral estoppel has no relevance here.

### III. "Fair Report" Privilege Does Not Apply to Statements Known to be False

Defendants argue that they are protected by the "fair report" privilege. But this argument ignores the issue at hand, treating NPA's suit as one for the original publication of the Articles. As NPA states in its Complaint, its claims are about continued publication. Compl., ECF 1, ¶¶ 3, 103, 117–18. For this reason, and because Defendants' refusal to retract the Articles once they knew they were false and defamatory was, in fact, not in accord with the "fair report" privilege, Defendants' arguments here fail.

Although "[t]he dissemination of news by the communications media has traditionally been safeguarded by . . . [t]he privilege attached to the reporting of public proceedings," *Patten v. Smith*, 360 N.E.2d 233, 236 (Ind. Ct. App. 1977), this privilege is not unlimited. As NPA notes, *see* Compl., ECF 1, ¶ 99, "In Indiana, in a matter of public or general concern, both private figures and public figures must show that the defamatory statement was made with actual malice," *LDT Keller Farms, LLC v. Brigitte Holmes Livestock Co.*, No. 1:08-CV-243, 2010 WL 2608342, at *4 (N.D. Ind. June

25, 2010) (citing *Journal–Gazette Co., Inc. v. Bandido's, Inc.*, 712 N.E.2d 446, 452–54 (Ind.1999), which established the rule and applied it to a publisher of news media).

This "actual malice" standard is applied to reports about "governmental or public proceeding[s]," Mot. Dismiss, ECF 19, PageID#170 (citing *Huon v. Denton*, 841 F.3d 733, 740 (7th Cir. 2016)). "[T]he privilege for reporting on government proceedings [applies] . . . [w]here a publisher reports a statement . . . *provided there is no actual malice*." *Gertz v. Robert Welch, Inc.*, 680 F.2d 527, 536 (7th Cir. 1982) (emphasis added). "When . . . [a party] republi[shes] a third party's defamatory falsehoods . . . the actual malice finding may be upheld '"where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports."'" *Khawar v. Globe Intern., Inc.*, 19 Cal.4th 254, 275–76 (1998) (citing *Harte-Hanks Communications v. Connaughton*, 491 U.S. 657, 688 (1989)). And, of course, when we keep in mind that "actual malice" does not "mean 'ill will' but in fact means knowledge the statement is false," *Pippen v. NBCUniversal Media, LLC*, 734 F.3d 610, 612 (7th Cir. 2013), this is exactly what Sec. 577(2) enunciates, requiring removal of defamatory material that one "knows to be exhibited" in a forum he controls.

Even the Restatement's enunciation of the fair report doctrine, cited by Defendants, acknowledges its limits:

> Not only must the report be accurate, but it must be fair. . . . Thus, although it is unnecessary that the report be exhaustive and complete, it is necessary that nothing be omitted or misplaced in such a manner as to convey an erroneous impression . . . as for example a report of the discreditable testimony in a judicial proceeding and a failure to publish the exculpatory evidence . . . . It is not always necessary that the entire proceedings be reported at one time. However, when a newspaper publishes from day to day the report of a judicial proceeding, it may not, after reporting derogatory parts, fail to publish the further proceedings that tend to vindicate the person defamed.

Restatement (Second) of Torts § 611 (1977) cmt. F. Although this does not directly address the continued-publication rule, the policy is the same: "fair report" does not protect reporting that is not

fair. And a publisher's failure to act on *knowledge* of the defamatory nature of his report (thereby demonstrating actual malice) renders the report outside the defense's definition of "fair." *See also Aafco Heating & Air Conditioning Co. v. Nw. Publ'ns, Inc.*, 321 N.E.2d 580, 586 (Ind. Ct. App. 1974) (announcing Indiana rule of "actual malice" standard for matters of public concern; stating, "publisher knowledge of . . . facts which negate or materially contradict the impression conveyed by the published statements to some significant extent—would be highly probative evidence of awareness of probable falsity").

The continued-publication rule is in accord with this notion. *See Tacket*, 836 F.2d at 1047 ("A reasonable person could conclude that Delco 'intentionally and unreasonably fail[ed] to remove' this sign and thereby published its contents"). In short, the "fair report" privilege is limited by a principle that is inherent in the continued-publication rule itself: if a party knows that it is allowing defamation to take place, yet does nothing, the party cannot escape liability.

Further cases bear out this application of fair-report privilege to the continued-publication rule. In *Brown & Williamson Tobacco Corp. v. Jacobson*, the parties "disagree[d] over whether Jacobson's summary of [a governmental] report was 'fair,' that is, whether the overall impression created by the summary was no more defamatory than that created by the original." *Jacobson*, 713 F.2d 262, 270 (7th Cir. 1983) (citing Restatement (Second) of Torts § 611, Comment f (1977)). Applied to the framework of the continued-publication rule, then, the fair-report privilege would protect only those defendants who acted "fairly" in reference to knowledge of additional facts about matters of public concern, and a publication not including those facts would no longer be a fair summary of the original. Under the continued-publication rule, this means that, as to "defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control," Sec. 577(2), he must "remove" the matter when he gains such knowledge, *id.*

*Taub v. McClatchy Newspapers, Inc.*, which also dealt with "fair report," likewise held that "section 577 lends credence to the Court's belief that the Defendant may have acted unreasonably and/or recklessly by failing to remove from its website [an] offending article after it learned of both the article's presence and the article's inaccuracies." 504 F. Supp. 2d 74, 80 n.8 (D.S.C. 2007). And in yet another case, a court recognized that a state statute similar to Sec. 577(2) limited the fair report doctrine precisely as discussed here: "The fair report privilege is . . . lost if the defendant fails to honor a request for certain corrective action." *Files v. Deerfield Media (Mobile), Inc.*, No. CV 19-0742-WS-B, 2020 WL 1161089, at *4 (S.D. Ala. Mar. 10, 2020) (citing Ala. Code § 13A-11-161, statute encoding "fair report" defense, including limitations with policy similar to Sec. 577(2), under which the privilege did not apply if "the defendant . . . refused or neglected to publish in the same manner in which the publication complained of appeared, a reasonable explanation or contradiction thereof by the plaintiff, or that the publisher has refused upon the written request of the plaintiff to publish the subsequent determination of such suit, action or investigation").

Thus, the "fair report" privilege does not shield Defendants in this case.

### IV. NPA's Defamation Claim Meets the Elements of Continued-Publication Defamation, Including Actual Malice

### A.      NPA Has Sufficiently Pled Actual Malice Under Sec. 577(2)

Defendants state that NPA, in order to succeed, was required to plead actual malice "at the time of publication," Mot. Dismiss, ECF 19, PageID#171. The Complaint discusses and does allege actual malice, ¶¶ 99–102, 118, but Defendants' assertion that actual malice is required at the time of publication ignores NPA's actual claim, which falls under the continued-publication rule.

That rule does not require a pleading that actual malice existed *at the time of publication*. Rather, it imposes liability for "intentionally and unreasonably fail[ing] to remove defamatory matter that [one] knows to be exhibited on land or chattels in his possession or under his control . . . ."

*Tacket*, 836 F.2d at 1046 (quoting Sec. 577(2)). In other words, the rule contemplates liability for a party's failure to remove defamatory matter *after the party gains knowledge that he is exhibiting defamatory matter*. Because the rule specifically contemplates events arising *after* publication, to read this as imposing an intent element at the time of publication is to render the law meaningless. It would be odd indeed if, despite requiring a party to remove defamatory material only after notice of the defamatory material, a rule simultaneously required that the party have knowledge at the time of publication of the material's defamatory nature.

In support of the proposition that "NPA was required to allege . . . actual malice 'at the time of publication,'" Mot. Dismiss, ECF 19, PageID#173 (citation omitted), Defendants rely on *Fairfax v. CBS Corp.*, 2 F.4th 286 (4th Cir. 2021). Yet this reliance in itself demonstrates Defendants' failure to address NPA's claim: the plaintiff in *Fairfax* did not invoke the continued-publication rule, and the case does not discuss it.[7]

Because Defendants misstate the required pleading here, their argument fails to show that NPA has not made a plausible allegation of actual malice as required under these facts.

**B.    Defendants' Failure to Retract Shows the Malice a Sec. 577(2) Pleading Requires**

In addressing whether Defendants' failure to retract their articles when given notice of the articles' false and defamatory nature demonstrated the requisite intent, Defendants claim that "a refusal to retract is insufficient to show an earlier statement was made with actual malice . . . ." Mot.

---

[7]In the case, "Fairfax attempt[ed] to meet [the actual malice] standard with allegations intended to show that CBS failed to investigate [his accusers'] accounts despite reason to question their credibility[,] . . . claim[ing] CBS had obvious reasons to doubt [the accusers'] veracity and yet failed to investigate their accusations or shielded itself from the truth." 2 F. 4th at 293. However, Fairfax's "amended complaint fail[ed] to allege facts that make these contentions plausible." *Id.* In other words, *Fairfax* was about whether the plaintiff had shown intent at the time of the initial publication, not about whether the plaintiff had made a showing of the requisite intent under the continued-publication rule that applies in this case, *Tacket*, 836 F.2d at 1046. There was no question of the sort presented.

Dismiss, ECF 19, PageID#177 (citing *Pippen*, 734 F.3d at 614–15). This again ignores the framework of the continued-publication rule, which does not contemplate whether the "earlier" statement was made with actual malice, but only whether the publication was continued with knowledge of its defamatory nature, that is, actual malice. However, it is worth noting that the quote Defendants provide, *id*., from *Pippen*, "The Supreme Court also has said that actual malice cannot be inferred from a publisher's failure to retract a statement once it learns it to be false," 734 F.3d at 614 (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 286–87 (1964)), refers to a statement that the Supreme Court explicitly limited to the specific circumstances immediately before it, stating, "*The Times*' failure to retract upon respondent's demand . . . [is] not adequate evidence of malice for constitutional purposes. *Whether or not a failure to retract may ever constitute such evidence*, there are two reasons why it does not *here*." *New York Times Co.*, 376 U.S. at 286–87 (emphasis added).

And the same is true of *Biro v. Conde Nast*, also cited by Defendants. Mot. Dismiss, ECF 19, PageID#177. As Defendants note, *Biro*'s discussion of a party's refusal to retract a publication is limited to whether it offers any "probative value as to a defendant's state of mind *at the time* of publication," *Biro*, 963 F.Supp.2d 255, 281 (S.D.N.Y. 2013). This is true also of *Fairfax*, already discussed *supra* note 7.

Because Defendants with this argument do not address the claim made by NPA, and furthermore cite only inapplicable caselaw, this argument fails.

## C.   As Discussed in the Complaint, Indiana Does Recognize the Continued-Publication Rule, Which Is Not in Conflict With the Single-Publication Rule

Defendants spend much ink discussing the single-publication rule, but they misapprehend its relevance to the "continued publication" rule. This is discussed *supra* pp. 2–4, and we further address Defendants' arguments honed in on the single-publication rule here.

As discussed, in *Tacket*, the Seventh Circuit applied the continued-publication rule in a case arising under Indiana law, announcing, "We predict that Indiana will follow § 577(2)," 836 F.2d at 1046. Defendants state that this rule means "that if a defendant printed 50 copies of a book in 50 states, it could be sued 50 separate times." Mot. Dismiss, ECF 19,  PageID#178, going on to recount the Supreme Court's observation in 1984 that most states had adopted the "single publication rule," *id.* But it is hard to imagine how a rule requiring removal of defamatory material is given *once the party has received notice* could possibly create so many claims. Defendants have cited no law, statutory, common, or otherwise, suggesting that the continued-publication rule allows a new cause of action for second, third, fourth (and so on) notices, nor that it somehow nullifies the definition of a "single publication." And NPA has not advocated such a law. Once a party has knowledge, it has knowledge. New claims do not accrue under the continued-publication rule simply because the party is *reminded* anew, nor on the basis that the defamatory material may appear in multiple printings or throughout multiple updates to a website on which an unchanged article is posted.

Therefore, although Defendants treat the single-publication rule as the opposite of the continued-publication rule, the two do not conflict. As Defendants state, the single-publication rule protects a publisher from repeated liability by providing that only one action can be maintained against any publisher of "[a]ny one edition of a book or newspaper . . . ." Mot. Dismiss, ECF 19, PageID#179 (citing Restatement (Second) of Torts § 577A(3)). This, of course, does not conflict with a rule imposing liability for a party's failure to remove defamatory material once that party has knowledge of the defamatory nature of the material. NPA does not seek to recover under a "multiple publication" theory whereby new claims would accrue "every day that . . . defamatory statement[s] remain[] online after a publisher learns of" their falsity, *Pippen*, 734 F.3d at 615. Rather, it seeks recovery under the rule the Seventh Circuit has predicted Indiana would follow, *Tacket*, 836 F.2d

at 1046 (in which it there is no suggestion that application of the continued-publication rule could somehow result in multiple liability for a single publication).

Furthermore, as Defendants additionally point out, the *Pippen* court observed that the policy behind the wide adoption of the single-publication rule is that in the age of the internet, failing to do so "would eviscerate the statute of limitations and expose online publishers to potentially limitless liability." *Id.* The continued-publication rule does not harm this policy. Once a party is given notice that any "single publication" contains defamatory material, it then is required to retract that publication if it wishes to avoid liability. The continued-publication rule does not impose liability for every new notice that is given. Rather, one who "knows to be exhibited" defamatory material in something that he controls, and who "intentionally and unreasonably fails to remove" such material, is liable. Sec. 577(2). There is no liability for every time the party is *reminded* of the defamatory nature of the matter after he already possesses such knowledge.

Put a different way, when a party publishes defamatory material in a publication that is printed or distributed more than once, the single-publication rule protects that publisher by allowing liability to be imposed only once. The continued-publication rule does not provide a means by which to impose liability more than once. There is therefore no conflict between the two rules. The intent element is either present at the time of publication, and the statute of limitations starts to run at that time–and the single-publication rule, which "locks in" a claim that *has accrued*, becomes relevant at that time–or it is present when the "host" of defamatory material *does* gain knowledge that material he "hosts" is defamatory, and the statute of limitations begins to run (and the single-publication rule becomes relevant) at *that* time under the continued-publication rule.

Thus, *Pack v. Middlebury Cmty. Sch.*, on which Defendants rely, is wholly irrelevant to this case. Defendants note that in that case, "the Seventh Circuit explained . . . that '[t]he majority

approach to a defamation case involving a single statement posted online is to apply the single-publication rule.'" Mot. Dismiss, ECF 19, PageID#181 (quoting *Pack v. Middlebury Cmty. Sch.*, 990 F.3d 1013, 1020 (7th Cir. 2021)). But the plaintiff in that case argued that "each time anyone accesse[d] the [alleged defamation] on the internet," the defendant breached anew an agreement between the parties. The court analogized this to a defamation claim, where the single-publication rule would be applicable, and found that the single-publication rule should be applied. But the argument the court thereby rejected demonstrates that the single-publication rule is not relevant here: the single publication rule *applies to claims for repeat liability*. NPA does not argue for repeat liability or seek to apply a rule that would allow for repeat liability. This case is therefore inapplicable here.

Because NPA does not rely on a rule that conflicts with the single-publication rule, nor does NPA otherwise suggest the single-publication rule should be set aside, Defendants arguments here are inapplicable.

## D.    Sec. 577(2) Is Relevant

Of course, Defendants, after spending much ink discussing the single-publication rule, admit that it is not relevant to NPA's claims, stating, "the Restatement is clear that Section 577 has no relevance to the single-publication rule (the subject of § 577A)." Mot. Dismiss, ECF 19, PageID#181. Defendants claim as well that Sec. 577(2) specifically is not relevant, stating that the continued-publication rule "means only that a property-owner can be liable for *adopting* the defamatory statements *made by another third-party* on its property if the owner allows the defamatory statements to continue to remain published on its property." *Id.* at PageID#181–82 (emphasis in original).

This is a misunderstanding of the continued-publication rule. The continued-publication rule does not require that the defamatory matter at issue have been originally published by some third-party.[8] Sec. 577(2) does not indicate this, and courts have applied the rule to "[d]efendants' own publications . . . on their own websites [and print publications]," Mot. Dismiss, ECF 19, PageID#182 (bracketed language added). As Defendants note, *Taub* is one such case, stating, "Although a website may not constitute chattel in the traditional sense, section 577 lends credence to the Court's belief that the Defendant may have acted unreasonably and/or recklessly by failing to remove from its website the offending article after it learned of both the article's presence and the article's inaccuracies," 504 F. Supp. 2d at 80 n.8 (D.S.C. 2007). Defendants state that *Taub* "has been criticized and rejected by South Carolina trial and appellate courts," Mot. Dismiss, ECF 19, PageID#182, yet provide only one case criticizing *Taub* in any way.[9] Meanwhile (*contra* Defendants' claim that "[n]ot a single court has followed *Taub*'s reasoning," Mot. Dismiss, ECF 19, PageID#182), a more recent (2018) case *does* support *Taub*. *Danielson v. USAA Fed. Sav. Bank*, No. 6:17-CV-02849-AMQ, 2018 WL 2461981, at *2 (D.S.C. June 1, 2018) (relying on *Taub* in granting plaintiff leave to refile defamation claims, holding that new claims would have to be consistent with "the applicable pleading standards" on publication under *Taub*). *Accord Beisel v. Zerbe Twp.*, 11 Pa.

---

[8]Defendants misapprehend the import of NPA's assertion that the continued-publication "rule applies to statements by third parties," Compl., ECF 1, ¶ 106. *See* Mot. Dismiss, ECF 19, PageID##181–82. This demonstrates simply that one cannot escape liability by claiming that he was merely adopting what someone else—be it a police officer or otherwise—said first.

[9]Namely, the case here cited by Defendants is *Trexler v. The Ass'n Press*, in which the court rejected that plaintiff's argument "that South Carolina [did] not follow the majority view that the continued existence of a published work does not constitute continuous republication" and that the mere continued existence of articles on a website–and nothing more–meant that the articles were constantly being published. *Trexler*, No. 2010CP401249, 2013 WL 9963459, at *2. In other words, in rejecting the plaintiff's argument, the *Trexler* court rejected only an attempt at an inapposite application of *Taub* that had nothing to do with Sec. 577(2), which is not concerned with whether continuing existence is tantamount to continued publication.

D. & C.3d 541, 543 (Pa. Com. Pl. 1979) (where township supervisor, at meeting of supervisors, made allegedly defamatory comments about plaintiff that were recorded in the minutes, court found that supervisors' refusal of plaintiff's later request to remove said comments from the minutes constituted continued publication as described in Sec. 577(2)). And of course, even the *Tacket* court itself did not suggest that it needed evidence that the individual(s) who wrote the defamatory message were not agents of the defendant. *See generally Tacket*, 836 F.2d 1042.[10]

Defendants cite *Roberts v. McAfee, Inc.* for the notion that Sec. 577(2) is not applicable. But as they state plainly, that opinion explicitly said that the Restatement's Sec. 577(2) was not applicable *in that case*, Mot. Dismiss, ECF 19, PageID#183, the facts of which were not analogous to this one. In that case, the single-publication rule *was* at issue, and the plaintiff argued that the statement at issue had been "republished." 660 F.3d 1156, 1167 (9th Cir. 2011). Again, NPA does not allege that the statements at issue in this case were republished, but only that they fall under the continued-publication rule, which in no way "would eviscerate the single publication rule" or "create[] continuing liability," Mot. Dismiss, ECF 19, PageID#183, but rather allows only for one claim, as explained *supra* Part IV(C). Therefore, *Roberts* is inapplicable here–and of course, we may

---

[10]*Tacket* heavily implies that it *was* defendant Delco's employees who created the defamatory sign at issue: "The union . . . protested the subcontracting . . . [and] suspected that Tacket was the 'T,' of 'S & T Specialties' [company to which work Delco could have done was subcontracted]. . . . The workers started spreading rumors about . . . Tacket as soon as they learned about the subcontracting. . . . Meanwhile a sign . . . appeared inside Plant 17 proclaiming 'TACKET TACKET WHAT A RACKET'." The implication was strong enough that a Harvard journal did not hesitate to say, "Tacket's fellow employees . . . inscrib[ed] the phrase . . . ." Gregory M. Dickinson, *An Interpretive Framework for Narrower Immunity Under Section 230 of the Communications Decency Act*, 33 Harv. J.L. & Pub. Pol'y 863, 878 (2010). And the lower court had not hesitated to so surmise, either: "although no one knew who painted the smaller sign, it was probably the product of the hourly personnel's satirical propensities." *Tacket v. Delco Remy Div. of Gen. Motors Corp.*, 678 F. Supp. 1387, 1392 (S.D. Ind.).

more easily note that it is inapplicable under the law of Indiana, which the Seventh Circuit has "predict[ed] . . . will follow § 577(2)." *Tacket*, 836 F.2d at 1046.

Thus, while Defendants read into the continued-publication rule the notion that it applies only to adoption, this is not how the courts have treated the rule, and the cases Defendants cite for their proposition are inapposite. Accordingly, Defendants have cast no doubt on the relevance of Sec. 577(2).

### V. The Wire-Service Defense is Inapplicable Here

Defendants assert that the AP article is protected by the wire-service defense. Mot. Dismiss, ECF 19, PageID#183–84. The wire-service defense, however, provides simply that a publisher is not negligent who relies on a reputable newspaper and "demonstrate[s] ordinary care in *preparing and transmitting* the article." *Winn v. Associated Press*, 903 F. Supp. 575, 580 (S.D.N.Y. 1995), *aff'd*, 104 F.3d 350 (2d Cir. 1996) (emphasis added). NPA has not made any assertion about whether the AP was negligent in preparing and transmitting its article, but only that it met the continued-publication rule's intent element in its failure to remove the article: "Defendants possessed not only 'a high degree of awareness of the[] probable falsity' of these articles . . . but actual '*knowledge* that [they were] false' and defamatory, . . . yet unreasonably failed to remove them after ample notice. They have therefore defamed NPA with actual malice by their continued publication of these articles." Compl., ECF 1, ¶ 118 (citing *Mimms v. CVS Pharmacy, Inc.*, 889 F.3d 865, 868 (7th Cir. 2018)) (emphasis added) (nested citations omitted).

That the wire-service defense is not applicable in this case becomes even more clear when we recognize what the wire-service defense is at base: it

> is not so much a defense as it is a definition of a local news organization's duty: " . . . to ensure that the face of the story itself does not contain any inconsistencies . . . [and] to refrain from publishing the news story if the news

organization knows the story is false or if the release itself contains unexplained inconsistencies."

*Howe v. Detroit Free Press, Inc.*, 555 N.W.2d 738, 740 (1996), *aff'd*, 457 Mich. 871, 586 N.W.2d 85 (1998) (citing *Brown v. Courier Herald Publishing Co., Inc.*, 700 F.Supp. 534, 537 (S.D.Ga.1988)). The continued-publication rule imposes a duty to remove defamatory matter when it is known. The wire-service defense's recognition of a similar duty can hardly be said to waive this duty.

Of course, Defendants have not asserted that the wire-service defense actually provides a defense to continued publication with actual malice. And even if it did have some limited application here, caselaw has amply demonstrated what is apparent in the nature of the defense itself: if a defendant did *not* "demonstrate[] ordinary care" in its publication, *Winn*, 903 F. Supp. at 580, the defense does not apply. Thus, in a case in which "the plaintiff has shown that the defendants knew, or should have known, of certain facts extraneous to the wire service stories which would have raised doubts as to the stories' veracity . . . republication without independent verification might well raise a triable issue of negligence . . . ." *Appleby v. Daily Hampshire Gazette*, 478 N.E.2d 721, 726 (1985); *Brown*, 700 F. Supp. at 537 ("The local media organization also has a duty to refrain from publishing the news story if the news organization knows the story is false"); *Howe*, 555 N.W.2d at 740.

Therefore, the wire-service defense, by demonstrating that news publishers have a duty to refrain from publishing material they know to be false and defamatory, shows that the continued-publication rule, far from being the outlandish and rejected rule Defendants attempt to portray it as, is in line with prevailing policy on defamation. Furthermore, because the wire-service defense is inapplicable to continued publication with actual malice (and, to the extent its equities are applicable,

they show only that publishers do have certain duties that Defendants neglected), it does not serve to shield Defendants.

## VI. The Defamatory Statements are Not Mere Opinion or Hyperbole

### A.    The Statements are Factual, Which All Context Demonstrates

Defendants contend that "the police statements and alerts quoted in Defendants' articles are not actionable because they were expressing the police chiefs' and officer's opinion . . . ." Mot. Dismiss, ECF 19, PageID#185. But the Articles' description of these "statements and alerts," like the "statements and alerts" themselves, were a far cry from opinion statements. The 'Scam' Article's statements (for example) that "four police departments . . . issue[d] 'scam alerts'" (Compl. Ex. 1, ECF 1-3, PageID#30), and that "[NPA] has been flagged for scam alerts at police departments around the country" (*id.* at PageID#31 (photo caption)), that a police chief "reported [NPA] to the U.S. Postal Inspection Service over what he considered to be fraudulent mail" (*id.* at PageID#35) and said (with no qualifying or limiting language), "'It's a scam. . . . It's no different than any other scam — just a different angle'" (*id.*), and that another police chief "said the letter was crafted as 'pleas to those who are easily preyed upon'" (*id.* at PageID#37), do not indicate these are mere opinions offered off-the-cuff, or pending further investigation. Scam alerts, a report to the Postal Inspection Service, and a characterization of the fundraising letters as predatory—these all demonstrate that the "scam" statements were meant to be taken as factual conclusions by professionals, not mere opinions or hyperbole.

And even if *these* somehow could be read as opinions, surely the statements that NPA's fundraising "falsely warned that Germantown is a sanctuary city" (*id.* at PageID#35), "us[ed] [Trenton Police Department's] name . . . to raise funds" (*id.* at PageID#31), "announce[d] [Belle Isle, Florida] [was] a sanctuary city, and [it is] not" (*id.* at PageID#37)—surely these statements,

discussing the actual facts of the letters and of the municipalities' designation (or lack thereof) as

sanctuary cities, cannot be framed as opinion. And, of course, the AP article and the second *Star*

article contain much of the same. Compl., ECF 1, ¶¶ 31–35, 39, 42–45 (AP article), 49–53, 56,

59–60 (second *Star* article).

      Regardless, the Supreme Court views the matter of opinion statements quite differently than

Defendants seem to:

> [W]e do not . . . [recognize] a wholesale defamation exemption for anything that
> might be labeled "opinion." . . . Not only would such an interpretation be contrary to
> the tenor and context of the passage, but it would also ignore the fact that expressions
> of "opinion" may often imply an assertion of objective fact.
>
> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of
> facts which lead to the conclusion that Jones told an untruth. Even if the speaker
> states the facts upon which he bases his opinion, if those facts are either incorrect or
> incomplete, or if his assessment of them is erroneous, the statement may still imply
> a false assertion of fact. Simply couching such statements in terms of opinion does
> not dispel these implications; and the statement, "In my opinion Jones is a liar," can
> cause as much damage to reputation as the statement, "Jones is a liar."

*Milkovich v. Lorain J. Co.*, 497 U.S. 1, 18–19 (1990). And the opinions of professionals on a matter

within their expertise–such as law enforcement calling an act a "scam," that is, a crime, and using

community alerts—are the most susceptible to being understood not as statements of mere opinion,

but of fact. Therefore, if the Supreme Court's warning against voiding liability by classifying a

statement as mere opinion is applicable anywhere, it is in cases precisely like this one.

      Therefore, the handful of cases Defendants cite for the proposition that allegations of "scam"

should be taken as opinion (Mot. Dismiss, ECF 19, PageID##185–86)—none of which concerned

*police* allegations of scam, much less allegations coupled with community alerts and a report to the

Postal Inspection Service—are inapplicable here. Indeed, the Seventh Circuit has held that "the

defamatory capability of these terms [including 'scam'] cannot be determined without consideration

of context" and that "[i]f untrue . . . a literal use could be defamatory," *Dilworth v. Dudley*, 75 F.3d

307, 310 (7th Cir. 1996) (specifically noting "scam" as one such term, noting that in the *McCabe v. Rattiner*, 814 F.2d 839 (1st Cir.1987) case relied upon by Defendants, the determination on "scam" *was* context-dependant).

Indiana courts likewise recognize that "[i]n making the determination [whether a statement is defamatory], the communication is to be viewed in context and . . . in light of the circumstances of [its] utterance . . . includ[ing] the nature and extent of the audience receiving the publication." *Rambo v. Cohen*, 587 N.E.2d 140, 145, 148 (Ind. Ct. App. 1992). This would, of course, include whether the audience consisted of citizens being told by authorities on crime that certain acts were "scams"—a term that, as discussed in the Complaint, ¶¶ 17–18, refers to crime. Nor does telling residents to "do [their] homework" so that they do not fall prey to alleged scams somehow render the "scam" allegation hyperbolic, *contra* Defendants' claim, Mot. Dismiss, ECF 19, PageID#186. In this context, "scam" was clearly not meant to be hyperbolic or figurative. *See* Compl., ECF 1, ¶¶ 96–98.

A Seventh Circuit district court came to the same conclusion in *Telewizja Polska USA, Inc. v. Echostar Satellite Corp.*, in which a broadcasting service claimed it had been defamed by one of its affiliates (Telewizja Polska) after the relation between the two soured. *Telewizja*, No. 02 C 3293, 2004 WL 7339192, at *1–2 (N.D. Ill. Sept. 1, 2004). The affiliate had allegedly stated that the broadcasting service "was 'scamming' Polska of subscription fees and monies owed" under the parties' agreement. *Id.* at *7. The court, acknowledging that certain "words . . . can be found defamatory only where the context in which they are made forecloses an innocent construction . . . as non-actionable hyperbole" and that "[t]he innocent-construction rule requires courts to give words and their implications their natural and obvious meaning," found that "the statement is naturally construed as an accusation of actual conduct carried out contrary to obligation. As such it clearly

imputes a lack of integrity, foreclosing innocent construction," concluding that the broadcasting service had "sufficiently stated a claim for defamation per se." *Id.*

In addition to rejecting the "innocent hyperbole" argument, the court similarly rejected the argument that the defamatory statement was mere opinion, noting that while the word "scamming," without context, "could pass the test" as mere opinion, this is not so when the claimant "does not confine its allegation to this one word." *Id.* at *8. That is, if "[t]he statements alleged are assertions of actual conduct . . . that are sufficiently factual as to be susceptible to being proven true or false . . . [t]hey are not constitutionally protected under the First Amendment." *Id.*

As was the case in *Telewizja Polska*, here the defamatory statements at issue are not simply that NPA "scams," but rather that certain events that actually happened and affected real people, which events are described as fact, constitute "scams." As discussed above, these are not the type of statements that are protected as mere hyperbole or opinion.

**B.    The Disclosure of Facts Alone Does Not Make a Statement Opinion, and Here Not All Relevant Facts Were Disclosed**

Defendants further their arguments that the articles at issue are opinions and therefore not defamatory because the "scam" statements they contain "are based on non-defamatory facts"—that is, the fundraising letters sent by NPA—"that have been laid out in full." Mot. Dismiss, ECF 19, PageID#187. This argument is inapplicable since, as discussed *supra* Parts III and V, under the continued-publication rule, Defendants were required to retract the defamatory articles since they had not updated them with *exculpatory* facts–that is, the very reason this suit arises is because the articles did *not* disclose all pertinent facts (and then, was not retracted when the continued-publication rule required it to be).

Beyond that, this argument fails because it simply affirms the consequent. While the fact is that none of the articles at issue included the full detail of all of the fundraising letters (the first

*Star* article included an image of the letters to Trenton and Belle Isle—but not Germantown—and the second an image of the one to Trenton, while the AP article included none of the letters), on a more basic level, this argument is simply a continuation of Defendants' argument that opinion statements cannot be defamatory ("[the statements] are non-actionable pure opinions," *id.*). But, just it is untrue that calling something an "opinion" magically dispels any possibility of liability no matter how "factual" the alleged "opinion" seemed, it is equally untrue that any statement based in disclosed facts must be construed as an opinion. And none of the authorities cited by Defendants suggest that that is the case. Rather, they say that "a statement *in the form of an opinion*" based on disclosed facts "is not actionable apart from those facts," *Stevens v. Tillman*, 855 F.2d 394, 400 (7th Cir. 1988) (cited in Mot. Dismiss, ECF 19, PageID#187); that "[a] simple *expression of opinion*" which is "based on disclosed . . . facts is not itself sufficient for an action of defamation," Restatement (Second) of Torts § 566 cmt. c (cited in Mot. Dismiss, ECF 19, PageID#187). Defendants put the cart before the horse. These authorities do not hold that any statement based on disclosed facts is an opinion, but rather that a statement that *is* an opinion *and* is based in disclosed facts may not be actionable. As discussed above, these statements do not even qualify as opinions.

Therefore, Defendants cannot take advantage of this defense even to the extent certain facts actually were disclosed. For this reason, and because Defendants' argument here is not applicable under the continued-publication rule, this argument fails.

## Conclusion

NPA has alleged that Defendants have defamed NPA with actual malice by their continued publication of the Articles. Defendants have not shown in their Motion to Dismiss that any of the elements have not been plausibly alleged. Defendants have not disputed what Plaintiff has alleged about damages. Defendants suggest that the "fair report" privilege protects their defamatory statements, but this privilege does not apply if there is actual malice, which did exist in this case. And while Defendants allege that NPA has not shown actual malice at the time of publication, such a showing is not required under Sec. 577(2); rather, a claimant must show such malice as demonstrated by (per the rule) the fact that a defendant "knows [defamatory matter] to be exhibited" in a forum he controls, yet fails to remove it. NPA has plausibly alleged such knowledge. And Defendants, despite ample efforts to show conflict between the single-publication rule and the continued-publication rule, have cited no precedent that supports that allegation. In turn, they have not shown that NPA has failed to plausibly allege publication as set forth in the continued-publication rule.

Therefore, in light of the facts that this suit was brought well within the statute of limitations, within three months of the claim accruing, that neither collateral estoppel nor issue preclusion bar its case, and that Defendants are protected neither by the wire-service defense nor the bare assertion that the statements at issue were mere non-actionable opinion or hyperbole, Defendants have failed to cast doubt that NPA has plausibly alleged the defamatory nature of the Articles or that NPA's claim is otherwise barred. All told, NPA has plausibly alleged "(1) a communication with defamatory imputation, (2) [actual] malice, (3) [continued] publication, and (4) damages." *Carney v. Patino*, 114 N.E.3d 20, 28 n.3 (Ind. Ct. App. 2018) (internal quotation marks omitted) (bracketed

language added) (citing *Davidson v. Perron*, 716 N.E.2d 29, 37 (Ind. Ct. App. 1999) *trans. denied*

(2000)).

      For these reasons and all reasons discussed above, Defendants' motion to dismiss should be

denied.

                            Respectfully submitted,

                            /s/ Courtney Turner Milbank
                            James Bopp, Jr., IN # 2838-84
                            Courtney Turner Milbank, IN# 32178-29
                            Joseph D. Maughon, VA# 87799*
                            The Bopp Law Firm, PC
                            1 South Sixth Street
                            Terre Haute, IN 47807-3510
                            (812) 232-2434 - Telephone
                            (812) 235-3685 - Facsimile
                            jboppjr@aol.com
                            cmilbank@bopplaw.com
                            jmaughon@bopplaw.com
                            *Counsel for Plaintiff*
                            *\*Admitted pro hac vice*

**Certificate of Service**

I hereby certify that on August 23, 2021, I electronically filed the foregoing document with the Clerk of the Court using the electronic court filing system, which will provide notification of such filing to counsel of record.

/s/ Courtney Turner Milbank
Courtney Turner Milbank