UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| NATIONAL POLICE | ) | |
| ASSOCIATION, INC. | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | |
| vs. | ) | CAUSE NO. 1:21-cv-1116 RLM-DLP |
| | ) | |
| GANNETT CO., INC, *et al.*, | ) | |
| | ) | |
| *Defendants* | ) | |

## ORDER

The National Police Association filed suit against the Gannett Company and the Associated Press, alleging defamation after Gannett and the Associated Press refused to retract stories related to fundraising efforts by the National Police Association. The defendant's motion to dismiss the National Police Association's claim is now before the court. [Doc. No. 19]. For reasons explained in this opinion the court grants the defendants' motion to dismiss.

## I. STANDARD OF REVIEW

A court considering a Rule 12(b)(6) motion to dismiss construes the complaint in the light most favorable to the nonmoving party, accepts all well-pleaded facts as true, and draws all inferences in the nonmoving party's favor. Reynolds v. CB Sports Bar, Inc., 623 F.3d 1143, 1146 (7th Cir. 2010). But Fed. R. Civ. P. 8(a)(2) "demands more than an unadorned, the-defendant-unlawfully-

harmed-me accusation." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. at 678 (quoting Bell Atl. v. Twombly, 550 U.S. at 570). A claim is plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Bell Atl. v. Twombly, 550 U.S. at 556). Twombly and Iqbal "require the plaintiff to 'provid[e] some specific facts' to support the legal claims asserted in the complaint." McCauley v. City of Chi., 671 F.3d 611, 616 (7th Cir. 2011) (quoting Brooks v. Ross, 578 F.3d 574, 581 (7th Cir. 2009)). The plaintiff "must give enough details about the subject-matter of the case to present a story that holds together." Swanson v. Citibank, N.A., 614 F.3d 400, 404 (7th Cir. 2010).

## II. STATEMENT OF FACTS

The court takes the following facts from the National Police Association's as true for the purpose of the defendants' motion to dismiss. The National Police Association is a 501(c)(3) educational corporation whose mission is to educate supporters of law enforcement in how they can help support police departments. The NPA achieves its mission by issuing public service announcements, writing articles about law enforcement, and initiating legal filings, among other activities. Its revenue comes from individual and organizational donors.

The Indianapolis Star, owned by Gannett Company, Inc., and the Associated Press, Inc., published articles about the National Police Association in 2019. The Indianapolis Star published a story on March 17, 2019, titled "This Indianapolis charity says it helps police. Police chiefs say it's a scam." The story explained that at least four police departments in four different states had issued "scam alerts" to their communities after the National Police Association sent solicitations for donations in those communities. The story claimed the NPA falsely warned that Germantown, Wisconsin, was a "sanctuary city" and that the police chief in Germantown reported the National Police Association to the U.S. Postal Inspection Service for fraud. The story described the reactions to solicitations by police chiefs in Trenton, Michigan, and Belle Isle, Florida, as well. Trenton residents received solicitations in the mail that said, "Give our law enforcement officers the crime prevention tools they need. A donation of $10, $15 or $25 would help keep communities like Trenton safe." The article quoted the Trenton police chief as responding, "I'm thinking, 'What the hell is this, using our name and our police department to raise funds?' . . . Get out of here." The article described similar mailers that residents of Belle Isle received, describing Belle Isle as a sanctuary city. Their police chief responded by posting a "scam alert" about the National Police Association's solicitations on Facebook and saying that Belle Isle has a large population of elderly residents and the solicitation was crafted as "pleas to those who are easily preyed upon."

The Associated Press published a similar article titled "Police Question Authenticity of Nonprofit's Fundraising" on March 18, 2019. The article

described much of the same as the Indianapolis Star's claims: the National Police Association wrongly claimed Germantown, Wisconsin, was a sanctuary city in solicitations; the Trenton Police Department issued a scam warning over the solicitations and the Trenton police chief reported the solicitations to the U.S. Postal Inspection Service for fraud, describing them as "a scam . . . no different than any other scam – just a different angle"; and critics characterized the solicitations as "target[ing] vulnerable people and us[ing] fear-mongering language."

The Indianapolis Star published another article, titled "A pro-police Indianapolis nonprofit is suing 2 police officers," to its website on July 15, 2019. The article described the National Police Association's lawsuit against the Trenton Police Department and described how police departments had claimed the National Police Association's solicitations were scams and issued scam warnings to residents. The articles repeated some details from the earlier article, such as Trenton police officers' criticism that the solicitations aimed to raise money by suggesting that proceeds would benefit the Trenton Police Department.

After publication of the articles, officials who were quoted in the articles or who could speak on behalf of departments and municipalities retracted or clarified their statements. The village administrator of Germanton, Wisconsin, wrote a letter to the National Police Association saying that residents had received mailers stating that "Germantown [was] a sanctuary area," but also that the National Police Association had provided information that Milwaukee and Milwaukee Public Schools had sanctuary city policies. The village administrator

4

confirmed that Germantown is in the Milwaukee metropolitan area, reaffirmed that Germantown isn't a sanctuary city, and explained that Germantown confirmed that the National Police Association was an actual organization with the Internal Revenue Service.

The Trenton Police Department revised its Facebook post, explaining that the National Police Association didn't use the police department's name in its solicitations and that it was an actual organization. It removed any reference to the word "scam."

The City of Belle Isle updated its Facebook post, too. It explained that the National Police Association's solicitations described Belle Isle as being in a sanctuary area, and that in fact, Belle Isle was in a county designated as a sanctuary area. It also confirmed that the National Police Association was an "official organization."

Counsel for the National Police Association sent notice to the Indianapolis Star's publisher and the AP's Indiana bureau chief of the false and defamatory information in all three articles. The letters described the articles' inaccuracies and demanded a retraction, as is required to file a libel suit against a newspaper in Indiana. Ind. Code § 34-15-4-2. The Indianapolis Star's publisher responded four days later, on February 23, 2021, saying he disagreed with the NPA's assertions and didn't think the articles should be retracted or were actionable. The Indianapolis Star didn't retract either article. The AP's Indiana bureau chief responded on March 1, 2021, also claiming the articles contained no errors and expressing an intent not to retract. The AP didn't retract the article.

After the publishers expressed an intent not to retract the articles, the National Police Association sued both defendants for one count of "continued publication defamation." The National Police Association contends that accusations of operating a scam are defamation per se and that by failing to retract the articles once the municipalities in the stories walked back their statements, the defendants defamed the National Police Association. The National Police Association claims presumed damages under a defamation per se theory and actual damages of up to $91,851 for one year and up to $1,636,737 for twenty years, which represents the cost of rehabilitating the National Police Association's reputation. The defendants move to dismiss with prejudice.

III. Discussion

The defendants argue that the National Police Association's claim should be dismissed because the National Police Association doesn't allege, and concedes that it doesn't allege, actual malice at the original time of publication. A plaintiff alleging defamation must establish actual malice by showing the publisher was "aware of the inaccuracy at the time publication or had serious doubts as to its accuracy." Journal-Gazette Co. v. Bandido's, Inc., 712 N.E.2d 446, 462 (Ind. 1999). The defendants make several other arguments, as well, relating to the statute of limitations, collateral estoppel, the fair reporting privilege, and the wire-service defense.

The National Police Association concedes that its defamation claim isn't for the original publication of the articles but is for the "continued publication"

of the articles. Pl.'s Br. 12. The National Police Association seems to concede that if its claim were for the original publication, then some of the defendants' defenses would defeat the claim; two the articles were originally published outside the statute of limitations and the fair reporting privilege would apply to all three original publications. Pl.'s Br. 8–9 (statute of limitations), 12–15 (fair reporting privilege).

The National Police Association argues that its claim is nevertheless saved by § 577(2) of the Restatement (Second) of Torts, which the National Police Association refers to as the "continued-publication" rule. The Court of Appeals for the Seventh Circuit predicted that Indiana would adopt § 577(2). Tacket v. General Motors Corp., 836 F.2d 1042 (7th Cir. 1987). According to the National Police Association, this rule imposes liability on a defendant who publishes an article without malice, later discovers some of the published statements are false, and refuses to retract the article. The National Police Association asserts that because a § 577(2) claim accrues after publication, a plaintiff needn't show malice at the time of publication and a defendant can't raise any defense based on facts at the time of publication, such as the statute of limitations, fair reporting privilege, and wire service defense.

The National Police Association concedes that its claim depends entirely on the "continued-publication" rule, so the court's first inquiry is the narrow and specific question of whether the "continued-publication" rule from Tacket v. General Motors Corp. operates as the National Police Association describes.

The continued publication rule comes from the Restatement (Second) of Torts § 577, titled "What Constitutes Publication." The first subsection explains that "[p]ublication of defamatory matter is its communication intentionally or by a negligent act to one other than the person defamed." Id. § 577(1). The National Police Association invokes the second subsection, which reads, "One who intentionally and unreasonably fails to remove defamatory matter that he knows to be exhibited on land or chattels in his possession or under his control is subject to liability for its continued publication." Id. § 577(2). The Restatement explains that the basis of § 577(2) is the property owner's duty not to permit his property to be used "for a purpose damaging to others outside the land" and that the property owner is "required only to exercise reasonable care to abate the defamation, and he need not take steps that are unreasonable if the burden other measures outweighs the harm to the plaintiff." Id. cmt. p. The Restatement illustrates the rule with the example of a tavern owner who discovers graffiti in the restroom accusing a woman of being unchaste; if the tavern owner discovers the graffiti and doesn't remove it promptly, despite having ample opportunity to do so, he could be liable for the defamatory statement. Id. (illustrating Hellar v. Bianco, 244 P.2d 757 (Cal. Dist. Ct. App. 1952)).

In Tacket v. General Motors Corp., 836 F.2d 1042 (7th Cir. 1987), the court predicted that Indiana would adopt § 577(2) as a basis for defamation liability. In Tacket, someone anonymously painted the words "TACKET TACKET WHAT A RACKET" on the wall of a factory belonging to the defendant. Id. at 1043–1044. The sign was defamatory because of workplace rumors that the plaintiff had been

dishonest and abused his position for financial gain. Id. at 1044–1045. The sign remained on the factory wall for seven to eight months before factory management had the sign painted over. Id. at 1044. One coworker testified that it could have remained on the wall only if management had acquiesced or approved of the sign. Id. 1047. The Tacket court applied § 577(2) to impose liability on the defendant, characterizing § 577(2) as "[a]doption of another's publication" and "publication of the libel by failure to remove the message." Id. at 1046. The court explained that whether a defendant adopts a statement depends on the degree of control the defendant has over the area and the cost of vigilance and mitigation. Based on an adoption theory, the control the defendant had over the sign, and the amount of time that had passed, the defendant could be found to have adopted the statement by intentionally and unreasonably failing to remove it. Id. at 1047.

The National Police Association's "continued-publication" rule goes beyond what § 577(2) and Tacket are really about, which is adoption of another's statement, not failure to retract one's own statement. The facts of Tacket show that § 577(2) is limited in this way—the communication at issue in Tacket was written by some unknown third party and adopted by the defendant pursuant to § 577(2). The court described § 577(2) as based on the "old basis of liability" of "[a]doption of another's publication." Id. at 1047. Nothing in the facts of the case or the court's discussion of the rule suggests the court envisioned § 577(2) applying to a defendant's own publication.

The Restatement suggests the same, even if § 577(2) doesn't expressly stop short of the National Police Association's proposed rule. The sole illustration for § 577(2) describes liability for a third-party communication, as does the case on which the illustration is based. Restatement (Second) of Torts § 577(2) cmt. p.; Hellar v. Bianco, 244 P.2d 757 (Cal. Dist. Ct. App. 1952). In light of Tacket and the Restatement, the rule might more aptly be the "adoption" rule of publication rather than the "continued-publication" rule. Contrary to the National Police Association's reading, Tacket and § 577(2) don't create defamation liability for a publisher who refuses to retract its own publication when that publisher didn't act with actual malice when originally publishing the material.

The National Police Association's theory conflicts with other rules in defamation law, confirming that its reliance of § 577(2) and Tacket is misplaced. First is the single-publication rule, which limits a publisher's liability to a single defamation claim for the first publication of an edition of a book or newspaper. Pack v. Middlebury Cmty. Sch., 990 F.3d 1013, 1020–1021 (7th Cir. 2021). The single-publication rule protects publishers against potentially limitless liability and the retriggering of the statute of limitations Pippen v. NBCUniversal Media, LLC, 734 F.3d 610, 615–616 (7th Cir. 2013). The same policies underlying the single-publication rule apply to online publications, id., and the Seventh Circuit has predicted Indiana would adopt the rule for online publications. Pack v. Middlebury Cmty. Sch., 990 F.3d at 1021.

The National Police Association argues the single-publication rule doesn't conflict with the "continued-publication rule" because § 577(2) doesn't impose

10

endless liability, but just one more claim for liability upon failure to retract. Pl.'s Br. 18–19. That's true of a third party's defamatory communication because the defendant who adopts the statement pursuant to § 577(2) couldn't have been liable for the original publication of the statement. But when the defendant could be liable both for publishing and refusing to retract an article, the National Police Association's "continued-publication" rule would undermine the single-publication rule. Roberts v. McAfee, Inc., 660 F.3d 1156, 1168–1169 (9th Cir. 2011); Rainbow v. WPIX, Inc., 117 N.Y.S.3d 51, 53 (N.Y. App. Div. 2020). The National Police Association downplays this additional liability as only one additional claim against the defendant, but doesn't offer limiting principles to what could be a vast carveout of the single-publication rule. Their rule could allow multiple separate claims if a publisher discovered on separate occasions that different portions of an article turned out to be false, undermining the single-publication rule's concern against multiplicity of suits. The single-publication rule is meant to prevent retriggering the statute of limitations, as well, but the National Police Association doesn't explain whether there's an outer limit to when a claim could accrue. If the claim accrues upon refusal to retract, as the National Police Association asserts, a claim could ostensibly accrue at any point after publication, undermining the single-publication rule's concern against retriggering the statute of limitations. Roberts v. McAfee, Inc., 660 F.3d 1156, 1168 (9th Cir. 2011) ("A newspaper article published forty years ago whose veracity is called into question today could subject the publisher to a defamation

suit. Such a result would be entirely at odds with the goal of the single-publication rule.").

The National Police Association's version of the continued publication rule is also suspect because it is indistinguishable from a duty to retract, which has no basis in law. The National Police Association explains that the defendants' liability turns entirely on their decision not to retract or update the articles upon the National Police Association's request, but the court knows of no authority for an affirmative duty to retract based on revelations after publication. See McFarlane v. Sheridan Square Press, 91 F.3d 1501, 1515 (D.C. Cir. 1996) ("[Plaintiff] presents no authority, however, nor are we aware of any, for the proposition that a publisher may be liable for defamation because it fails to retract a statement upon which grave doubt is cast after its publication."); Coughlin v. Westinghouse Broad. & Cable, Inc., 689 F. Supp. 483, 489–490 (E.D. Pa. 1988); Berdell v. Wong, 46 N.E.3d 115 (Mass. App. Ct. 2016). Retraction might be probative of actual malice at the time of publication and might mitigate damages, Milsap v. Journal/Sentinel, Inc., 100 F.3d 1265, 1271 (7th Cir. 1996); Biro v. Condé Nast, 963 F. Supp. 2d 255, 281 (S.D.N.Y. 2013), but failure to retract isn't its own defamation claim. No known authority imposes a duty to retract and § 577(2) reads as governing adoption of another's statement. It would be strange to impose a duty to retract against that backdrop merely because the NPA was able to read § 577(2) in a creative way.

The National Police Association hasn't stated a claim on which relief could be granted. Tacket and § 577(2) show that a property owner can be liable for

adoption of another's statement, but not for failing to retract one's own. Reading § 577(2) as the National Police Association does would cut against <u>Tacket</u> as well as the single-publication rule, and would impose a novel duty to retract. Because § 577(2) doesn't cover the NPA's allegations as it has argued and the NPA concededly doesn't allege malice at the time of publication , the NPA hasn't stated a claim on which relief could be granted.

## IV. CONCLUSION

The National Police Association doesn't allege actual malice at the time of publication and concedes that its claim rests on its interpretation of § 577(2). Contrary to the NPA's assertions, § 577(2) doesn't impose liability for a failure to retract one's own statement, so the NPA hasn't stated a claim on which relief could be granted. Ordinarily, courts should give a party the opportunity to amend an original complaint before dismissing an entire case, so the court will grant the National Police Association leave to amend its complaint. Accordingly, the court GRANTS the defendants' motion to dismiss the NPA's claim, [Doc. No. 19], and GRANTS the National Police Association leave to file an amended complaint within fourteen days of this order, if appropriate.

SO ORDERED.

ENTERED:   February 28, 2022

   /s/ Robert L. Miller, Jr.   
Judge, United States District Court

Distribution:  All electronically registered counsel of record.

13